# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

GYN & FERTILITY SPECIALISTS, INC. )
and MAGDI M. HANAFI, M.D., )
                                    )
    Plaintiffs, )
                                    )
    *vs.* )
                                    )
SAINT JOSEPH'S HOSPITAL OF )
ATLANTA, INC.; EMORY )
HEALTHCARE, INC.; GARY ALLEN )
LUDI, M.D., individually and as )
Chief of Staff of Emory Saint Joseph's )
Hospital of Atlanta, Inc.; THOMAS P. )
MCGAHAN, M.D., individually )
and as Medical Operating Officer of Saint )
Joseph's Hospital of Atlanta, Inc., SHERRY )
ROGERS; MARGARET WILLIAMSON, )
individually and as Chair of the Peer Review )
Committee of Saint Joseph's Hospital of )
Atlanta, Inc.; and DAVID ABRAHAM )
KOOBY, M.D., individually and as Chief )
of Surgery, Emory Saint Joseph's Hospital )
of Atlanta, Inc., )
                                    )
    Defendants. )

CIVIL ACTION FILE NO.

  1:22-CV-1753-TWT-RGV  

**JURY TRIAL DEMANDED**

_____

## VERIFIED COMPLAINT
_____

    **COME NOW** the Plaintiffs, **GYN & FERTILITY SPECIALISTS, INC**.

and **MAGDI M. HANAFI, M.D.** (hereinafter "Dr. Hanafi"), complaining of the

Defendants **SAINT JOSEPH'S HOSPITAL OF ATLANTA, INC.,** (hereinafter "Emory Saint Joseph's Hospital"); **EMORY HEALTHCARE, INC.** (hereinafter "Emory Healthcare"); **GARY ALLEN LUDI, M.D.**, individually and as Chief of Staff of Emory Saint Joseph's Hospital of Atlanta, Inc. (hereinafter "Defendant Ludi"); **THOMAS P. MCGAHAN, M.D.**, individually and as Medical Operating Officer of Saint Joseph's Hospital of Atlanta, Inc. (hereinafter "Defendant McGahan"), **SHERRY ROGERS** (hereinafter "Defendant Rogers") ; **MARGARET WILLIAMSON,** individually and as Chair of the Peer Review Committee of Saint Joseph's Hospital of Atlanta, Inc. (hereinafter "Defendant Williamson"); and **DAVID ABRAHAM KOOBY, M.D.,** individually and as Chief of Surgery, Emory Saint Joseph's Hospital of Atlanta, Inc., (hereinafter "Defendant Kooby").

## THE PARTIES

### *The Plaintiffs*

1.

Commencing in July 1979, Dr. Hanafi has conducted his medical practice under the name, "GYN & Fertility Specialists."

2.

Since 1997, Dr. Hanafi has conducted the business aspects of his medical practice through GYN & Fertility Specialists, Inc., a Georgia business corporation (hereinafter "GYN Fertility"). The business address and the registered office of GYN Fertility is 5673 Peachtree-Dunwoody Road, Suite 750, Fulton County, Georgia 30342. Dr. Hanafi is the sole shareholder, officer, and director of GYN Fertility. GYN Fertility is currently in good standing and has been duly authorized to bring this action to protect its corporate interests.

3.

For approximately forty-two (42) years, from and after 1979, Dr. Hanafi has actively and continuously practiced medicine in Georgia as a Gynecologist, and he has been an active member, in good standing, of the medical staff, with full clinical credentials, at Emory Saint Joseph's Hospital. Dr. Hanafi's hospital privileges at Emory Saint Joseph's Hospital were renewed, upon his application, every two years for a forty-year period. Prior to the events giving rise to this action, no person associated with Emory Saint Joseph's Hospital had raised any issue with respect to the quality of surgical care provided by Dr. Hanafi, in any cases classified as "Level III "or "Level IV." These levels are classified according to the level of severity, with the higher levels reflecting what are perceived to be more serious issues.

4.

Prior to the institution of the Peer Review proceedings that are the subject of this action, Dr. Hanafi served as Chief of Gynecology at Emory Saint Joseph's Hospital for two terms of two years each from 2015 through 2018, based upon his professional stature and his service to Emory Saint Joseph's Hospital.

5.

From and after 1995, Emory Saint Joseph's Hospital is the only hospital at which Dr. Hanafi has either sought or maintained clinical credentials.

6.

Dr. Hanafi is and, at all times relevant herein, has been a physician licensed to practice medicine in Georgia.

7.

Dr. Hanafi is Board Certified by the American Board of Obstetrics and Gynecology.

8.

Dr. Hanafi has participated, every year since 2000, in the "Voluntary Annual Recertification" program maintained by the American Board of Physician Specialties.

9.

Dr. Hanafi has published peer-reviewed medical papers, including publication in *Fertility and Sterility Journa*l, the official journal of the American Society of Reproductive Medicine and in the *Journal of the American College of Obstetricians and Gynecologists*.

10.

Dr. Hanafi is a Fellow of the American College of Surgeons, carrying the designation, "F.A.C.S.," which was awarded after a thorough evaluation of ethical fitness and professional competence.

11.

Dr. Hanafi is a Fellow of the American College of Obstetricians and Gynecologists (F.A.C.O.G.), and a Fellow of the International College of Surgeons (F.I.C.S.).

12.

Dr. Hanafi is a member of the American Association of Gynecological Laparoscopists, the American Society of Reproductive Medicine, the European Society of Human Reproduction, the American Institute of Ultrasound in Medicine, and other professional organizations.

13.

Dr. Hanafi was born in 1946, in Alexandria, Egypt and became a citizen of the United States in 1983.

14.

Dr. Hanafi graduated, with honors, from medical school in Alexandria, Egypt in 1969. Thereafter, he completed two additional years of training at Alexandria University Hospital as an intern and as a surgical resident.  Dr. Hanafi then completed a multi-year residency in England. He received a diploma in Obstetrics and Gynecology in 1975 from the Royal College of Ireland.

15.

Dr. Hanafi came to Atlanta in 1975 for a one-year internship in general surgery, under the auspices of the Emory University School of Medicine at St. Joseph, which was at that time located in downtown Atlanta.

16.

After his internship at St. Joseph, Dr. Hanafi completed his post-graduate training with a three-year residency in Obstetrics and Gynecology at Georgia Baptist Hospital in Atlanta.  Dr. Hanafi commenced his private practice of medicine in 1979.

17.

Dr. Hanafi has never suffered the imposition of an adverse final verdict or final civil judgment for professional negligence.

### ***The Defendants***

18.

Defendant Emory Saint Joseph's Hospital is a Georgia nonprofit corporation with its principal office at 5665 Peachtree Dunwoody Rd., Atlanta, Georgia 30342. Defendant Emory Saint Joseph's Hospital can be served with process by service on its registered agent, Amy Adelman, at 201 Dowman Drive, 312 Administration Building, Atlanta, DeKalb County, Georgia 30322.

19.

Defendant Emory Healthcare is a Georgia nonprofit corporation with its principal office at 201 Dowman Drive, N.E., 101 Administration Building, Atlanta, Georgia 30322. Defendant Emory Healthcare can be served with process through its registered agent, Amy Adelman, at 201 Dowman Drive, 312 Administration Building, Atlanta, DeKalb County, Georgia 30322.

20.

Defendant Ludi is a resident of Fulton County, Georgia and may be served with process at his residence at 2035 Azalea Drive, Roswell, Fulton County, Georgia

30075. At times relevant herein, Defendant Ludi was the "Chief of Staff" at Emory Saint Joseph's Hospital and, during the treatment of the patient who was the principal focus of the Peer Review actions taken against Dr. Hanafi, made critical clinical decisions involving the patient's treatment, without consulting Dr. Hanafi. Defendant Ludi has not been subjected to Peer Review proceedings as a result of his treatment of the patient.   Defendant Ludi, personally and as Chief of Staff, participated directly in the Peer Review proceedings that proximately caused the wrongful termination of Dr. Hanafi's surgical privileges.

21.

Defendant McGahan is a resident of DeKalb County, Georgia and may be served with process at his residence at 1401 East Clifton Road, N.E., Atlanta, DeKalb County, Georgia. At times relevant herein, Defendant McGahan was the Medical Operating Officer of Emory Saint Joseph's Hospital. Defendant McGahan, personally, and as Medical Operating Officer at Emory Saint Joseph's Hospital, participated directly in the Peer Review proceedings that proximately caused the wrongful termination of Dr. Hanafi's surgical privileges.

22.

Defendant Rogers may be served with process at 5665 Peachtree Dunwoody Road, Atlanta, Georgia 30342. At times relevant herein, Defendant Rogers was the

"Program Director of Robotics" at Emory Saint Joseph's Hospital and in this capacity contributed to, and participated in, the Peer Review proceedings that proximately caused the wrongful termination of Dr. Hanafi's surgical privileges, through the transmission of false information concerning Dr. Hanafi and his surgical outcomes.

23.

Defendant Williamson is a resident of Fulton County, Georgia and may be served with process at her residence at 1368 Wayne Avenue, N.E., Atlanta, Fulton County, Georgia 30306-3233. At times relevant herein, Defendant Williamson was the Chair of the Peer Review Committee at Emory Saint Joseph's Hospital. Defendant Williamson, personally, and as Chair of the Peer Review Committee, participated directly in the Peer Review proceedings that proximately caused the wrongful termination of Dr. Hanafi's surgical privileges.

24.

Defendant Kooby is a resident of Fulton County, Georgia and may be served with process at his residence at 1032 Wildwood Road, N.E., Atlanta, Fulton County, Georgia 30306 Emory Saint Joseph's Hospital. At times relevant herein, Defendant Kooby was the "Chief of Surgery" at Emory Saint Joseph's Hospital. Defendant Kooby, personally, and as Chief of Surgery, participated directly in the Peer Review

proceedings that proximately caused the wrongful termination of Dr. Hanafi's surgical privileges.

## JURISDICTION AND VENUE

### 25.

This Court has original subject matter jurisdiction, pursuant to 28 U.S.C. § 1331, granting jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." By reason of the national origins discrimination to which Dr. Hanafi was subjected by the Defendants, this controversy arises under the Constitution and statutes of the United States, including, *inter alia*, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, Pub. L. 88–352, title VI § 601, 78 Stat. 252 and Section 1557 of the Patient Protection and Affordable Care Act of 2010, 42 U.S.C. §18116 (a).

This Court has supplementary jurisdiction over the claims arising the laws of the State of Georgia, pursuant to 28 U.S. Code § 1367 (a), which provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution ... ."

Within this Court's original jurisdiction, Dr. Hanafi has standing to pursue Declaratory Relief, under federal and state law, in that he has suffered an injury in fact and there is a causal connection between the injury and the Defendants' conduct in violation of federal statutes.

26.

The Defendants, and each of them, are personally subject to the jurisdiction of this Court.  Venue is proper in this District and in this Division.

## **OPERATIVE FACTS**

27.

For a surgeon, access to operating rooms in a hospital setting is the *sine qua non* of a successful surgical practice. Access to operating rooms is provided only to surgeons who have been investigated and granted credentials to perform surgeries in the hospital's facilities. Thus, (a) access to state-of-the-art medical facilities, such as those at Emory Saint Joseph's Hospital and (b) membership on the surgical staff of a hospital are highly prized assets, both clinically and financially.

28.

The most desirable times to perform surgical procedures are in the early morning, in terms of medical outcomes and the ability of the surgeon to attend to the needs of other patients.

29.

At Emory Saint Joseph's Hospital, during the times relevant to this action, operating room times were made available to surgeons on the basis of seniority. Dr. Hanafi, by reasons of his four decades of practice at Emory Saint Joseph's Hospital, was afforded preferential access to the operating rooms, during so-called "Blocked Times," from 7:30 A.M. until 3:00 P.M. on Tuesdays and Thursdays of each week, from 2015 until his privileges were wrongfully suspended.

30.

Dr. Hanafi was an early adopter of robotic surgery, specifically the robotic surgical system known as "*da Vinci*®." Dr. Hanafi recognized that the system was peculiarly appropriate for gynecological surgery, and, after approval of the system by the Food and Drug Administration (FDA), he became proficient in robotic gynecologic surgery, including:

     (a)    Robotic laparoscopic hysterectomies (removal of the uterus in order to treat, *inter alia*, uterine fibroids and endometriosis);

     (b)    Robotic laparoscopic tubal reversal; and

     (c)    Robotic laparoscopic myomectomy (removal of fibroid tumors).

In addition to robotic surgery, during times relevant to this action, Dr. Hanafi performed endoscopic surgery at Emory Saint Joseph's Hospital and performed general gynecological surgeries.

31.

Dr. Hanafi discovered that there are at least four principal benefits of the *da Vinci®* robotic surgical system:

(1)     Better precision, because the surgeon sits at a computer screen that magnifies the intricacies of the surgery, allowing clearer images of the surgical site. Also, the small robotic arms are able to reach things better than the larger human hand.

(2)     Robotic surgeries are less invasive than traditional surgeries, often with only four small incisions in the abdomen of the patient. Therefore, recovery times are shortened.

(3)     There is less blood loss, because incisions required for robotic surgeries are much smaller than traditional surgeries.

(4)     There is less scarring, because the incision for robotic surgery is smaller; the scars on the abdomen of the patient are less noticeable.

32.

Commencing after January 2012, significant changes in the administrative and clinical operations of Emory Saint Joseph's Hospital were made by Emory Healthcare. The principal clinical changes were affected through the Emory Clinic, Inc., d/b/a the "Emory Clinic," a Georgia not-for-profit corporation, which describes itself as "the most extensive physician group practice in Georgia." The approximately 980 physicians of the Emory Clinic are affiliated with the Emory School of Medicine and include specialists, sub-specialists, and primary care physicians.

33.

With the arrival of the Emory Clinic at Emory Saint Joseph's Hospital, many physicians left Emory Saint Joseph's Hospital, including many surgeons, and became affiliated with Northside Hospital, a direct competitor of Emory Saint Joseph's Hospital, located literally across the street. Northside Hospital and Emory Saint Joseph's Hospital draw patients from same geographic market and many of the same health care service markets.

34.

At times relevant herein, Defendant Kooby was a member of the Emory Clinic and a professor at the Emory School of Medicine. He was "Chief of Emory Surgery

in the Northern Arc" for both Emory Saint Joseph's Hospital and Emory John's Creek Hospital, and he served as Chief of Surgery and as a member of the Board of Directors of Emory Saint Joseph's Hospital.

35.

At times relevant to this action, Emory Saint Joseph's Hospital had approximately fifteen (15) in-patient operating rooms, depending on configuration, but only five (5) operating rooms were suitable for use of the *da Vinci*® system.

36.

After the arrival of the Emory Clinic, and of direct impact on Dr. Hanafi's practice, Gynecologic Oncologists, who perform surgeries to remove cancerous tissue and tumors, were contractual employees of Emory Healthcare or the Emory Clinic, not independent physicians in the manner of Dr. Hanafi. These Gynecologic Oncologists affiliated with Emory desired to use the *da Vinci*® robotic surgical system. The Emory interests, including Emory Healthcare and the Emory Clinic, thus had a direct financial stake in their Gynecologic Oncologists obtaining access to surgical facilities and to the *da Vinci*® system at Emory Saint Joseph's Hospital.

### _Preliminary Efforts to Eliminate Dr. Hanafi's Perceived Advantages_

37.

After the arrival of the Emory Clinic, the Gynecologic Oncologists affiliated with the Emory Clinic and Emory Healthcare repeatedly complained within staff and hospital meetings that they could not obtain access to surgical facilities, sometimes until 3:00 P.M., and not during the preferred early morning time slots.   The complaints were directed toward Dr. Hanafi and his use of the _da Vinci_® system and his preferential times in the operating rooms.   Dr. Hanafi perceived that the complaints were generated out a sense of personal animus toward him, based upon his foreign place of birth.

38.

The Peer Review proceedings that were subsequently instituted against Dr. Hanafi were, as more fully alleged below, initiated for multiple reasons, including, but not limited to, the perception that Dr. Hanafi, who was not a member of the Emory Clinic, was, by reason of seniority and training, viewed by Defendant Emory Healthcare and the Emory Clinic as having disproportionate access to Emory Saint Joseph's Hospital's surgical facilities and to the _da Vinci_® robotic surgery technology.   Thus, the removal of Dr. Hanafi created substantial financial benefits for the Emory Clinic. As more particularly alleged below, an adverse surgical

outcome in one of Dr. Hanafi's cases (Patient Y.H.) was used as a pretext in order to remove him and as a method for Defendant Emory Saint Joseph's Hospital and Emory Healthcare to seek to avoid liability for claims arising from the case of Patient Y.H.  Upon information and belief, the records of Emory Saint Joseph's Hospital will demonstrate that Peer Review proceedings, such as those instituted against Dr. Hanafi, have been more disproportionately used against foreign born and trained American physicians.

39.

In furtherance of the effort to remove Dr. Hanafi from advantageous access to the *da Vinci*® robotic surgery system, after the arrival of the Emory Clinic at Emory Saint Joseph's Hospital, a non-physician administrator, Ms. Sherry Rogers, was installed, without any input from Dr. Hanafi, as "Program Director of Robotics." Defendant Rogers has no medical or nursing degree, no medical or nursing license, and had no prior experience in the performance of any surgical procedures, including, but not limited to, use of the *da Vinci*® system in robotically assisted surgeries.

40.

During 2017, Defendant Rogers transmitted an email to all of the individuals involved in robotic surgery at Emory Saint Joseph's Hospital.  The email stated that

Defendant Rogers was forming "a committee for robotic surgery," and she named the physicians to be placed on her committee. All of the physicians that she named were born and trained in the United States.

41.

Dr. Hanafi vigorously objected that Defendant Rogers did not have authority to form such a committee without his approval, because of Dr. Hanafi's position as Chief of Gynecology.

42.

Defendant Kooby confronted Dr. Hanafi about the email Dr. Hanafi sent to Defendant Rogers that Dr. Kooby described as "too harsh."

43.

Also, in furtherance of the efforts to eliminate Dr. Hanafi's perceived advantages, Dr. Mark P. Lachiewicz approached Dr. Hanafi about obtaining access to the robotic surgical system for other Emory Clinic members, including Dr. Lesley S. Conrad. At St. Joseph's Medical Executive Committee ("M.E.C.") meetings, Dr. Lachiewicz regularly argued that the "Blocked Time" should be made available to the Emory Clinic's Gynecologic Oncologists. Dr. Lachiewicz persisted in his efforts, and he and Dr. Conrad frequently confronted Dr. Hanafi about the issue, whenever they encountered Dr. Hanafi.

44.

As an additional effort to eliminate Dr. Hanafi's perceived advantages, in 2017, Defendant Emory Healthcare, at the behest of Defendant Rogers, refused to renew a significant number of Surgical Assistants' credentials. Dr. Hanafi did not understand why such a decision was made and, upon inquiry, no explanation was provided to him. This non-renewal of Surgical Assistants' credentials occurred immediately following Dr. Hanafi's confrontation with Defendant Rogers over her "committee for robotic surgery."   The non-renewal of Surgical Assistants was in retaliation for Dr. Hanafi's confrontation over the "committee for robotic surgery."

45.

For a period of approximately three months in 2017, Dr. Hanafi had difficulty performing robotic surgeries because Surgical Assistants were not available to assist him. Dr. Hanafi then personally recruited new Surgical Assistants. The lack of Surgical Assistants did not impact the Emory Clinic physicians, because they had residents and medical students from the Emory School of Medicine to assist them.

46.

After the foregoing efforts to eliminate Dr. Hanafi's perceived advantages proved to be unsuccessful, Defendant McGahan directed Defendant Rogers to review the hospital records of Dr. Hanafi's surgeries for the express purpose of

finding information that could be used "*to get rid of*" Dr. Hanafi. Upon information and belief, Defendant Rogers was the person who initially reported, falsely, that Patient Y.H. had gone into septic shock due to a bowel perforation. Upon information and belief, in this regard, Defendant Rogers provided false information concerning Patient Y.H. to Emory Saint Joseph's Hospital's Administration.

47.

Dr. Hanafi overheard Defendant Rogers bragging in a hallway at Emory Saint Joseph's Hospital to another female employee: "He [Dr. Hanafi] is ***out*** . . . you know who did that? ***Me***."

48.

Defendant Rogers is not licensed or trained to provide direct medical care to patients, and she is not qualified to do so. Nevertheless, Defendant Rogers improperly "assists" in surgeries involving the use of the *da Vinci*® robotic surgical system.

49.

By reason of her association with the Emory Clinic, Defendant Rogers is allowed to perform duties during surgeries that are facially improper. For example, Dr. Hanafi has observed Defendant Rogers handling tubing that was attached to a

patient, setting up surgical equipment (rather than the nurse or surgeon), and making adjustments to the robotic system during surgery.

### *Initiation of Efforts to Remove Dr. Hanafi*

50.

On December 27, 2018, Defendant McGahan provided a letter to Dr. Hanafi giving notice that the Emory Saint Joseph's Hospital's Peer Review Committee had identified two separate robotic surgery cases, which were said to be "Not Acceptable Care." Dr. Hanafi was given the option of ceasing robotic surgery or having the matter referred to the Emory Saint Joseph's Hospital's M.E.C. for further investigation.

51.

In response to Defendant McGahan's unexpected ultimatum, Dr. Hanafi met personally, on January 8, 2019, with Defendant McGahan and the Chief Executive Officer of Emory Saint Joseph's Hospital. He then met on January 9, 2019, with Defendant Ludi and Defendant McGahan.   Defendants made clear to Dr. Hanafi that Emory Saint Joseph's Hospital was concerned *only* about the quality of care provided by Dr. Hanafi to "Patient Y.H.," upon whom Dr. Hanafi had performed a robotically assisted hysterectomy in September 2018.

52.

Dr. Hanafi then prepared a comprehensive letter to the Emory Saint Joseph's Hospital's Medical Staff, which reflected his knowledge, as derived from the patient's charts, of the facts of Patient Y.H.'s case. Notwithstanding the information provided to Emory Saint Joseph's Hospital, a formal Peer Review process was wrongfully instituted against Dr. Hanafi.

53.

As alleged herein, the initiation of the Peer Review process against Dr. Hanafi by the Defendants, and each of them, was, upon information and belief, motivated by a malicious and unreasonable desire to:

(1) Strip Dr. Hanafi of all of his surgical privileges as an act of national origin animus and discrimination;

(2)   Strip Dr. Hanafi of his long-time "Blocked Time" privileges, earned by reason of his expertise in robotic surgery and his seniority; and

(3)   Strip Dr. Hanafi of his priority access to the *da Vinci*® robotic surgery system at Emory Saint Joseph's Hospital; and

(4)   Wrongfully blame the bad outcome experienced by patient Y.H. on Dr. Hanafi.

### *National Origin Discrimination Against Dr. Hanafi*

54.

Dr. Hanafi feels, and has felt for years, that he has been subjected to invidious discrimination by reason of the fact that he is a foreign-born American physician.

55.

Upon information and belief, Emory Saint Joseph's Hospital would not have sought to revoke Dr. Hanafi's credentials, if he were a native-born physician of European descent.

56.

Upon information and belief, Emory Saint Joseph's Hospital treats native-born physicians of European descent in a manner that is different, and more favorable, than the manner that it treats foreign-born American physicians. To this end, upon information and belief, the Peer Review process is used against foreign-born American physicians at Emory Saint Joseph's Hospital disproportionately in contrast to its use against native born "white" physicians.

57.

For example, at the hearing conducted as part of the Peer Review process to revoke Dr. Hanafi's surgical credentials, one of the concerns falsely raised against

him was that he was not sufficiently "social."  Dr. Hanafi understood this to be a reference to his race and national origin.

58.

Dr. Hanafi has, for many years, been compensated by Emory Saint Joseph's Hospital for the performance of certain duties is a manner that is substantially less favorable than the compensation of native-born-American physicians. Commencing in 2000, the Chief of Gynecology at Emory Saint Joseph's Hospital, prior to Dr. Hanafi, was Dr. Joseph Francis Boveri, a Gynecologic Oncologist (cancer specialist), who reached an agreement with Emory Saint Joseph's Hospital to be paid $600.00 per day to be "on call" to cover gynecological cases at the Emergency Room of Emory Saint Joseph's Hospital.

59.

Dr. Boveri asked Dr. Hanafi to cover the Emergency Room at Emory Saint Joseph's Hospital when Dr. Boveri was out of town, and Dr. Hanafi covered for Dr. Boveri without compensation.

60.

Ultimately, Dr. Hanafi asked the administration at Emory Saint Joseph's Hospital to provide compensation to him in the same manner as the compensation provided to Dr. Boveri.

61.

The administration at Emory Saint Joseph's Hospital failed and refused to compensate Dr. Hanafi and refused to explain this decision.

62.

Notwithstanding Emory Saint Joseph's Hospital's refusal to pay equal compensation, Dr. Hanafi continued to cover the Emergency Room at Emory Saint Joseph's Hospital for free after the arrival of the Emory Clinic up until the wrongful suspension of his privileges in February 2019. Upon information and belief, Emory Clinic physicians are compensated for covering the Emergency Room at Emory Saint Joseph's Hospital, while Dr. Hanafi was expected to provide these services without compensation.

63.

Dr. Hanafi immediately perceived upon her employment that Defendant Rogers, as Emory's "Program Director of Robotics," did not like him, personally, because he was a foreign-born American physician.

64.

The committee that "investigated" Dr. Hanafi during the Peer Review process, including Defendant Kooby, Stephen M. Szabo, M.D., and Dr. Lachiewicz, were all

native-born-American physicians. No member of the committee was a foreign-born American physician or physician of color.

66.

66.

Throughout the years of his affiliation with Emory Saint Joseph's Hospital, Dr. Hanafi perceived, as a result of subtle and explicit indications, that he was treated in a disadvantageous manner because he was a foreign-born American physician.

***The Pretextual Claims Involving Patient Y.H.***

66.

In the course of the Peer Review process instituted against Dr. Hanafi, the principal instance of improper medical care alleged against him was a female patient identified as "Patient Y.H."

67.

This was a surgical case in which Dr. Hanafi converted a robotic assisted surgery to an open exploratory laparotomy due to the severity of pelvic adhesions and the high BMI of the patient.

68.

The false allegations against Dr. Hanafi involving Patient Y.H. were pretextual in that they were made in order to remove Dr. Hanafi from his perceived

advantages to assign blame and scapegoat him for the result in Patient Y.H.'s case, all of such actions being acts of national origin discrimination.

69.

The allegations against Dr. Hanafi were pretextual because they were false reasons designed to hide the true intentions and motivations of those physicians making the allegations. The pre-textual allegations against Dr. Hanafi were not made in order to improve health care but were intentionally made in order to harm Dr. Hanafi and to improve the professional and financial circumstances of those persons making the allegations, and to cover up the real cause of the patient's shock, which involved an overdose of narcotics.

70.

Demonstrative of the pretextual nature of the allegations made against Dr. Hanafi is the fact that after the events involving Patient Y.H., Dr. Hanafi continued, on a daily basis, for 180 days, to perform surgeries at Emory Saint Joseph's Hospital, without any clinical difficulties.

71.

Dr. Hanafi performed surgery on Patient Y.H. on September 13, 2018.

72.

Patient Y.H. was discharged from Emory Saint Joseph's Hospital on September 15, 2018. As part of her discharge instructions, Dr. Hanafi prescribed a very low dosage of narcotic medication for post-surgical pain, a dosage which alone would not have induced shock.

73.

After discharge and while at home, Patient Y.H. ate chicken and rice, contrary to Dr. Hanafi's explicit advice that she maintain a purely liquid diet.

74.

Patient Y.H. returned to the Emergency Room at Emory Saint Joseph's Hospital on September16, 2018 complaining of gastrointestinal pain. Patient Y.H. was conscious and moving of her own accord. A computed tomography (CT) scan was performed. Patient Y.H. was then re-admitted to Emory Saint Joseph's Hospital under Dr. Hanafi's name.

75.

At the time of her re-admission, Patient Y.H. was complaining of abdominal pain, but she did not have an elevated temperature or other symptoms of infection. Gentamicin, a powerful antibiotic, and Flagyl, another drug used to fight infection, were administered to Patient Y.H. intravenously, in order to prevent any abdominal

infection. Blood cultures were obtained at least twice after re-admission, and showed no signs of infection.

76.

At the time of Patient Y.H.'s re-admission, an abdominal CT scan was performed in order to discern if there was any sign of leakage from her bowel.  A second CT scan was performed one day later. A third abdominal CT scan was performed three days after the second scan. All three scans were negative for any indicia of leakage from the bowel.

77.

At the time of her re-admission, and thereafter, all appropriate diagnostic tools indicated that Patient Y.H. did not have "sepsis," a condition in which foreign bacteria threatens organ function. At the time of her re-admission, and thereafter, Dr. Hanafi provided medical care that was totally consistent with all applicable standards.

78.

By midnight, on September 16-17, 2018, Patient Y.H. was not breathing well, and her blood oxygen was low. Dr. Hanafi recommended that Patient Y.H. be transferred to the Intensive Care Unit.

79.

Patient Y.H. was transferred to the Intensive Care Unit, and, once she was there, critical care physicians assumed responsibility for her care.

80.

Dr. William S. Bender and Dr. Lisa Daniels, who were, and are, members of the Emory Clinic, were the "critical care specialists" who were covering the ICU on the evening of September 16-17, 2018, and they ordered an intravenous Fentanyl drip for Patient Y.H. Fentanyl is a synthetic opioid with powerful analgesic effects but fewer side effects than morphine. It is often used in emergency departments to relieve severe pain from trauma.

81.

Dr. Daniels also ordered that Patient Y.H. be administered Versed (midazolam a/k/a. "Xanax"), which is also a controlled substance. Versed is a benzodiazepine, a type of drug that causes relaxation, sleepiness, and partial or complete loss of memory during use. It is frequently used to help the patient to tolerate a surgical procedure for which general anesthesia is not necessary.

82.

In Dr. Hanafi's medical judgment, the administration of Fentanyl and Versed, caused Patient Y.H. to lapse into cardiogenic shock, by reason of her underlying and

undisclosed condition of narcotic addiction. Patient Y.H. displayed symptoms of labored breathing and reduced oxygen levels which are consistent with a narcotic overdose.

83.

Dr. Hanafi had a disagreement with Dr. Bender on the following morning, September 18, 2018, about whether there was a perforation of Patient Y.H.'s bowel.

84.

Dr. William Bender called for Defendant Ludi, Chief of Surgery, to consult on the treatment of Patient Y.H. Dr. Ludi did not read the patient medical records or lab results, but promptly came to the false conclusion that the patient was suffering from septic shock due to a perforation of her bowel during Dr. Hanafi's surgery. Defendant Ludi then ordered an attempt to "aspirate" as small amount of intraperitoneal fluid through the insertion of a needle into the abdomen, a procedure that is contra-indicated in a patient with a distended bowel who is suffering from a narcotics overdose.

85.

Following multiple needle insertions, a small amount of greenish fluid aspirated from a loop of the bowel, which Defendant Ludi incorrectly concluded was an indication of a bowel perforation.

86.

Neither Dr. Bender nor Defendant Ludi recognized that the patient was in shock because the physicians in the Intensive Care Unit had administered an improper dosage of narcotics (Versed and Fentanyl) and had, then, failed to administer Narcan in order to reverse the effects of the resulting overdose.

87.

Defendant Ludi then improperly authorized exploratory surgery on Patient Y.H., who was in a narcotic-induced shock in order to find a bowel perforation that did not exist.

88.

Throughout the severe medical difficulties experienced by Patient Y.H., including additional, exploratory surgery and multiple imaging, such as CT scans, no bowel perforation requiring surgical repair was ever found.

89.

The misdiagnosis of Patient Y.H. by Defendant Ludi and Dr. Bender could have been remediated by the administration of Narcan, and by stabilization of the patient prior to the unnecessary exploratory surgery.

90.

Throughout the severe medical difficulties experienced by Patient Y.H., Dr. Ludi continued to claim vigorously that, contrary to the objective clinical evidence and the observations of the attending physicians, Dr. Hanafi had perforated Patient Y.H.'s bowel.

91.

Throughout the Peer Review process that resulted from the case of Patient Y.H., no member of the Review Panel ever actually reviewed Patient Y.H.'s chart.

### Dr. Hanafi's Performance Against Objective Qualitative Metrics

92.

The Peer Review Committee of Emory Saint Joseph's Hospital selected a total of seven (7) surgical cases performed by Dr. Hanafi during the period from February 2017 through February 2019. During this time, Dr. Hanafi performed two hundred forty-two (242) surgical cases. Thus, the Peer Review Committee analyzed only 2.8% his cases.

93.

From January 1, 2017, through March 3, 2019, three hundred fifty-two hysterectomies were performed at Emory Saint Joseph's Hospital, of which Dr. Hanafi performed ninety-eight (98). Within this data set, three qualitative metrics

demonstrate that Dr. Hanafi was well within relevant measurements. Data is maintained on the length of procedures because extended procedures are indicative of adverse outcomes. Data is also maintained on re-admission after hysterectomies, which is obviously a measure of adverse outcomes. Finally, data is maintained on bowel complications following hysterectomies.

94.

During the period of comparative qualitative analysis, the average duration of hysterectomies by physicians other than Dr. Hanafi was one hundred and ninety-nine (199) minutes. Dr. Hanafi's average time was one hundred and eighty-three (183) minutes. The average re-admission rate for other surgeons was ten and one half (10.5%) percent. Dr. Hanafi's re-admission rate was ten and three tenths (10.3%) percent.  The rate of digestive complications was nine tenths of one percent while Dr. Hanafi rate was a comparable rate of one (1.0%).  Dr. Hanafi's qualitative metrics were effectively *identical* to those of his peers.

### Dr. Hanafi's Continued Mental Acuity and Physical Abilities to Perform Surgery

95.

The Defendants have, collectively, claimed that Dr. Hanafi suffered a decline in his medical care skills as a result of a decline in surgical competency during 2017 and 2018.  At the request of Defendants, Dr. Hanafi underwent a comprehensive

health evaluation at the "Aging Surgeon Program" of Sinai Hospital in Baltimore, Maryland in March 2019. The evaluation provided favorable results in his internal medicine evaluation, his neurology evaluation, his physical and occupational therapy assessment, a hearing test, and an ophthalmology examination.

96.

At Sinai Hospital the neuropsychologist found that, while Dr. Hanafi exhibited mild cognitive difficulties, they could not be definitively assessed, because there was no functional corroboration. Also, the report noted that English is not Dr. Hanafi's native language and that language difficulties may have suppressed his scores. A reevaluation was suggested in six to twelve months.

97.

In contravention of the Sinai Hospital report and without any additional information whatsoever, the Investigative Subcommittee improperly concluded that Dr. Hanafi was deficient in processing information rapidly in making surgical decisions.

98.

The Investigative Subcommittee's action was unwarranted, predetermined, unhinged from the facts of the matter, and taken in bad faith.

### *Admission by Defendant Ludi that the Peer Review Process Was Undertaken for Pretextual Reasons*

99.

When confronted by Dr. Hanafi, Defendant Ludi acknowledged the falsity of his claims of a punctured bowel and indicated that he had just completed the litigation, as a defendant, of another, unrelated professional negligence case and that he could not endure what was expected to be a claim of professional negligence from Patient Y.H.

### *Offer to Trade Robotic Surgery for Continuation of Privileges*

100.

Prior to the formation of the Investigative Subcommittee as part of the Peer Review process and prior to Dr. Hanafi's initial suspension, Dr. Hanafi attended approximately five (5) "collegial" meetings with Defendant Ludi, Defendant Maghan, and Ms. Heather Dexter, Chief Executive Officer of Emory Saint Joseph's Hospital.

101.

At each such "collegial" meeting, Dr. McGahan and Dr. Ludi pressed Dr. Hanafi to give up robotic surgery "voluntarily," and told him that if he did not "voluntarily" give up robotic surgery, or if he talked publicly about patient Y.H. having been overdosed with narcotics, Dr. Hanafi would lose his hospital privileges.

No truly "collegial" meetings were ever held with Dr. Hanafi, as required by the By-Laws of Emory Saint Joseph's Hospital.

102.

On two separate occasions, Defendant Ludi, in his capacity as Chief of Surgery at Emory Saint Joseph's Hospital and as a member of the MEC, personally approached Dr. Hanafi and indicated that if Dr. Hanafi would relinquish his robotic surgery practice and his early morning Blocked Time, all Peer Review proceedings would be resolved without any further adverse action against him.

103.

At each such "collegial" meeting, Dr. Hanafi was told: "We will not investigate you if you sign a piece of paper that you will no longer do robotic surgery."

104.

At each such "collegial" meeting, Dr. Hanafi responded that he did nothing inconsistent with proper medical and surgical procedures. Dr. Hanafi further indicated that acceding to the proposal of his colleagues would destroy his practice, because eighty (80%) percent of his surgeries were robotic.

105.

At each such "collegial" meeting, Dr. Hanafi insisted that Patient Y.H. overdosed and that there had been no perforation of the bowel. As set forth herein, Dr. Hanafi's insistence was consistent with the results of each of the imaging procedures performed on Patient Y.H. and consistent with the observations of the board-certified urologist who was present during the hysterectomy performed on Patient Y.H.

106.

Defendant Ludi continued to insist falsely that that there had been a perforation of the bowel in the case of Patient Y.H.

107.

Notwithstanding the unquestionable evidence of the post-surgical imaging and the contemporaneous observation of a disinterested urological expert, Defendant Ludi falsely informed the Administration of Emory Saint Joseph's Hospital and, later, the members of the Investigative Subcommittee that Dr. Hanafi had perforated the bowel of Patient Y.H.

## _Continuation of Surgical Privileges Subsequent to the Case of Patient Y.H._

### 108.

During the time of the "collegial" meetings, Dr. Hanafi had been regularly and successfully performing surgeries, including robotic surgeries, without any adverse incident whatsoever, for six months, between September 2018 (the surgery on Patient Y.H.) and February 2019 (suspension of privileges).

### 109.

In response to the preliminary accusations against him, and prior to his suspension on February 19, 2019, Dr. Hanafi submitted letters in December 2018 and January 2019, defending himself and describing the narcotic overdose.

### 110.

Upon information and belief, Emory Saint Joseph's Hospital's decision to suspend Dr. Hanafi's privileges on February 19, 2019, approximately six months after the surgery on Patient Y.H., was motivated, in part, by Emory Saint Joseph's Hospital's desire to scapegoat Dr. Hanafi for the adverse outcome in the case of Patient Y.H., based upon the false narrative that he perforated Patient Y.H.'s bowel.

***Continued Attendance by Individual Physicians at Medical Seminars Presented by Dr. Hanafi***

### 111.

Throughout 2018, after the surgery on Y.H., Dr. Hanafi was participating in monthly conferences where he and other Gynecologists presented videos of procedures to discuss various clinical approaches. Drs. Mark P. Lachiewicz and Robert S. Kelley, D.O, regularly appeared at this conference, presented cases, and discussed surgeries. The Emory-affiliated Gynecologic Oncologists sometimes also came to hear Dr. Hanafi's presentations.

### 112.

Dr. Hanafi presented several surgical cases after the surgery on Y.H. His competence was never questioned at these presentations to his peers and colleagues.

### 113.

On February 20, 2019, Defendant Ludi notified Dr. Hanafi that his privileges had been suspended. Dr. Hanafi was, without warning, given notice of the suspension and informed that he was under investigation by Emory Saint Joseph's Hospital's M.E.C.

### *Defamation*

114.

As reflected in the meeting minutes of the M.E.C., Defendant McGahan and Defendant Williamson provided the M.E.C. with demonstrably false, inaccurate, and incomplete information concerning the case of Patient Y.H. and, generally, concerning Dr. Hanafi's surgical proficiency. Defendant McGahan and Defendant Williamson repeatedly represented to the M.E.C. that there had been a perforation of the bowel in the case of Patient Y.H.

115.

Defendant Williamson is the Chair of the Emory Saint Joseph's Hospital's Peer Review committee, and, in that capacity, she informed the M.E.C. that there was, in fact, a perforation of the bowel, but admitted at Dr. Hanafi's hearing that she had not reviewed Patient Y.H.'s chart and that she reached that conclusion without looking at the patient's chart.  Before the Hearing Panel, she said that Dr. Hanafi was a bad surgeon, but she had never seen any of his surgeries or been to any of his conferences. Defendant Williamson is an infectious disease doctor, not a surgeon and does not enter the surgical suites at Emory Saint Joseph's Hospital.

116.

In the late Fall 2018, Dr. John G. Pattaras, a urologist with the Emory Clinic, who holds the James C. Kennedy Chair of Prostate Surgery at the Emory University School of Medicine, met with Dr. Hanafi and warned him (Dr. Hanafi) that Defendant McGahan had told him (Dr. Pattaras) that Dr. Hanafi had perforated the bowel of Patient Y.H.   Dr. Pattaras then reviewed a video of Patient Y.H.'s hysterectomy and determined that Dr. Hanafi had performed the surgery in a medically appropriate manner.   During the Peer Review, Dr. Pattaras provided a letter supportive of Dr. Hanafi.

117.

Defendant McGahan's statement to Dr. Pattaras was false.

118.

Defendant McGahan's statement to Dr. Pattaras was defamatory.

119.

Defendant McGahan's statement was made with the intention of injuring Dr. Hanafi in his profession as a physician and surgeon.

### *Dr. Hanafi's Participation in the St. Joseph Peer Review Process and His Exhaustion of his Administrative Remedies*

120.

Dr. Hanafi understands that he was required to exhaust all administrative remedies available to him before seeking judicial intervention. Dr. Hanafi has now exhausted all administrative, non-judicial remedies available to him.

121.

The Emory Saint Joseph's Hospital's M.E.C. allegedly conducted its purported investigation through its "Investigative Subcommittee," and, based upon the recommendation of its Subcommittee, the M.E.C. wrote to Dr. Hanafi on May 24, 2019, permanently revoking his surgical privileges at Emory Saint Joseph's Hospital.

122.

According to the letter of May 24, 2019, the purported revocation of Dr. Hanafi's surgical privileges was made after the "Investigative Subcommittee" reviewed "various patient Peer Review records, interviewed various individuals and considered the results of [an] Aging Surgeon evaluation from Mt. Sinai."

123.

Article 7 of Emory Saint Joseph's Hospital's *Medical Staff Credentials Manual* establishes the procedure that Emory Saint Joseph's Hospital is required to follow when a physician's clinical privileges are suspended or revoked.

124.

Pursuant to Emory Saint Joseph's Hospital's *Medical Staff Credentials Manual 7.A.4.*, upon the revocation or suspension of clinical credentials, the physician is entitled to request a Fair Hearing within thirty (30) days of receipt of the notice of suspension or revocation.

125

On June 19, 2019, Dr. Hanafi demanded a "Fair Hearing" to contest the M.E.C.'s decision.

126.

*Medical Staff Credentials Manual 7.A.5(b) and 7.A.7(a)* requires that the Fair Hearing be scheduled to begin no sooner than thirty (30) days after the notice of the Fair Hearing is provided and a hearing panel of no less than three (3) members must be appointed.

127.

The alleged Fair Hearing did not start until six months later, and rather than being conducted on consecutive days, was conducted over five (5) separate sessions and was concluded on January 27, 2021.

128.

*Medical Staff Credentials Manual 7.D.3* provides that, after the Fair Hearing, the Fair Hearing Panel shall deliberate and render a recommendation, accompanied by a written report stating the basis for its recommendation.

129.

The *Medical Staff Credentials Manual 7.D.2* mandates that the Fair Hearing Panel shall recommend in favor of the Medical Executive Committee "*unless it finds that the individual who requested the Fair Hearing has proved, by a preponderance of the evidence, that the recommendation that prompted the Fair Hearing was arbitrary, capricious, or not supported by credible evidence.*" [Emphasis supplied.]

130.

On April 7, 2021, the Fair Hearing Panel issued its "Report and Decision," upholding the M.E.C.'s suspension of Dr. Hanafi's clinical credentials at Emory Saint Joseph's Hospital.

131.

The Fair Hearing Panel stated in their *Report and Decision* that it *"recognized that not every aspect of every case cited by the M.E.C. rose to a significant level of concern"* and that *"not every aspect of the evidence presented was, on its own, a basis for the final recommendation."* [Emphasis supplied.]

132.

Within ten (10) days after the notice of the Fair Hearing Panel's recommendation, either party can request an appeal, as provided in *Medical Staff Credentials Manual 7.E.1.* However, pursuant to *Medical Staff Credentials Manual 7.E.2.* the grounds for appeal are limited to:

(a)    A substantial failure to comply with the *Manual* or the *Bylaws* of Emory Saint Joseph's Hospital or its Medical Staff, during or prior to the Fair Hearing, so that the physician is denied a Fair Hearing; and/or

(b)    The recommendations of the Fair Hearing Panel were *"arbitrary"* or *"capricious"* or were *"not supported by credible evidence."* [Emphasis supplied.]

133.

On April 29, 2021, Dr. Hanafi submitted a "Request for Appeal," which was granted on May 12, 2021, and on June 11, 2021, Dr. Hanafi submitted his required written appeal statement.

134.

*Medical Staff Credentials Manual* 7.E.4(a) requires that the Chairperson of the Board of Trustees of Emory Healthcare appoint a Review Panel of not less than three (3) persons, to consider the record upon which the recommendation before it was made.

135.

*Medical Staff Credentials Manual* 7.E.4(b) provides that each party shall have the right to present a written statement in support of their position on appeal, and the Review Panel may allow, at its sole discretion, each party to make oral argument not to exceed thirty (30) minutes.

136.

The Review Panel shall then recommend final action to the Board and within 30 days, the Board shall render a final decision in writing. *Medical Staff Credentials Manual 7.E.4(d) and 7.E.5.*

137.

The final decision of the Board, pursuant to *Medical Staff Credentials Manual 7.E.6*f, following the appeal shall be effective immediately.

138.

On October 27, 2021, Defendant Emory Healthcare's "Board of Directors Review Panel" declined to reverse the Fair Hearing Panel's Report and Decision.

139.

As a result of the failure of Defendant Emory Healthcare to reverse the decision of the Panel, Dr. Hanafi's clinical credentials and medical staff membership at Emory Saint Joseph's Hospital were terminated.

140.

As a result of the foregoing actions of Defendants Emory Saint Joseph's Hospital and Emory Healthcare, Dr. Hanafi has no longer been able to perform surgical procedures.

141.

Pursuant to *Medical Staff Credentials Manual 7.E.7.,* a physician, whose credentials are revoked, may not apply for restoration of the clinical privileges for a period of five (5) years, unless the Board of Emory Healthcare provides otherwise.

### The Defendants' Statutory Limited Immunity

142.

In 1986, the Congress of the United States enacted the Health Care Quality Improvement Act, which sought to reduce costs and improve the quality of care in the United State. The Act, together with correlative legislation in the states, including the State of Georgia, sought to immunize health care professionals who performed "Peer Review" on colleagues who were providing sub-standard care and who suspended or revoked the credentials of those who were providing inferior care. In order to induce institutions and physicians to engage in such a system of Peer Review of quality, Congress created a "limited" statutory immunity, so long as the Peer Review processes are "reasonable."  The Georgia General Assembly followed suit and enacted legislation providing immunity, so long as the Peer Review processes are not the product of "malice."

143.

In the thirty-five years since its enactment, the Peer Review process, so long as it is focused on improving the quality of care, has performed as Congress intended, however, the system has, as in the present case, been perverted to serve as a weapon to crush competitors, to execute personal vendettas and professional jealousies, and to vindicate personal grievances, unrelated to the quality of patient

care.  In the present case, the Peer Review process has been used for a variety of improper purposes, all animated by an effort to engage in discrimination based upon Dr. Hanafi's country of birth.

144.

In a Peer Review proceeding, the physician bears the burden of proving that the Peer Review process was *not* objectively "reasonable."  As provided in 42 U.S.C § 11112(a), Peer Review actions are presumed to have met the statutory requirements, and the burden is placed on the physician to rebut the statutory presumption by a preponderance of the evidence. *Kolb v. Northside Hospital*, 342 Ga. App. 192, 195-96, 802 S.E.2d 413, 416-17 (2017).

145.

In actions such as this, under the Health Care Quality Improvement Act, immunity from damages, or the lack thereof, is a question of law for the court to decide.

146.

Georgia's state courts have held that Health Care Quality Improvement Act grants broad discretion to hospitals with regard to physician staff privilege decisions and have held that their role on review is not to substitute the court's judgment for that of the hospital's governing board or "reweigh" the evidence adduced regarding

the termination of medical staff privileges. *Patton v. St. Francis Hospital.*, 260 Ga. App. 202, 205, 581 S.E.2d 551 (2003).

147.

"Deference" is given to a hospital's Peer Review decision, even when the revocation of credentials was based on issues that were not "primarily medical." *Davenport v. Northeast Ga. Med. Center*, 247 Ga. App. 179, 186, 542 S.E.2d 525 (2000). The state of mind of the Peer Reviewers is immaterial under the federal Act, while "malicious motive" is proscribed by the text of the Georgia statute. *Taylor v. Kennestone Hospital., Inc.*, 266 Ga. App. 14, 19, 596 S.E.2d 179 (2004).

148.

Notwithstanding judicial "deference," a Peer Review action must be taken in the "reasonable belief" that it is in furtherance of quality healthcare through the restriction of incompetent behavior and would protect patients. *Patrick v. Floyd Medical Center*, 255 Ga. App. 435, 440, 565 S.E.2d 491, 497 (2002).

149.

While the Health Care Quality Improvement Act does not require that Fair Hearing procedures or overall, Peer Review proceedings satisfy a hospital's own Bylaws in order for immunity to apply, Georgia courts have mandated such compliance.

150.

The Health Care Quality Improvement Act bars the recovery of monetary damages against Peer Review bodies, and the participant's therein, so long as prescribed procedures are met.

151.

Peer Review actions meeting the requirements of 42 U.S.C § 11112(a) insulate the professional review body, its members, and staff from liability for money damages under federal or state law for claims arising out of their actions, with the exceptions set forth below. Declaratory and injunctive relief are available, under Federal law, if a Peer Review system has failed to meet the objective standards for immunity.

152.

The Health Care Quality Improvement Act provides immunity from damages only for professional review actions taken:

(1)     In the reasonable belief that the action was in furtherance of quality health care,

(2)     After a reasonable effort to obtain the facts of the matter,

(3)     After adequate notice and Fair Hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4)     In the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts. 42 U.S.C § 11112(a).

## "*Reasonableness" Under the Federal Immunity Statute*

153.

The Peer Review process implemented to revoke Dr. Hanafi's credentials was not "reasonable" and was the product of "malice" and was the product of invidious national origin discrimination.

154.

The Emory Saint Joseph's Hospital's Peer Review process, as (a) structured and (b) as applied to Dr. Hanafi, was not "reasonable" and was a product of "malice" and personal animus.

155.

The Report and Decision produced by the Emory Saint Joseph's Hospital's Peer Review process was arbitrary, unreasonable, and capricious and was not necessary to protect the welfare of Emory Saint Joseph's Hospital's patients.

156.

Deference should not be given to the Fair Hearing panel's decision, because the charges against Dr. Hanafi were based on false allegations and erroneous findings.

157.

However, as alleged herein, the clinical outcomes data of Dr. Hanafi, utilized in the Emory Saint Joseph's Hospital's Peer Review process and presented to the Fair Hearing panel, were better than the national rates.

158.

When, as in the present case of Dr. Hanafi, a Fair Hearing panel bases its decision on unspecified, generalized concerns from the alleged totality of the evidence and not on individualized issues, the hearing cannot be "fair." Due process requires that the physician being terminated be advised, specifically, of the negative findings against him. Otherwise, the process is not "reasonable."

159.

The reasonableness standards of 42 U.S.C. § 11112(a) is to be measured, on judicial review, by an objective standard.

160.

For a reviewing court to assess the objective fairness of any process, or any administrative conclusion, there must be a reviewable record, including specific data, consistent with patient confidentiality, supportive of the claim of clinical inadequacy.

161.

The Fair Hearing Panel's Report and Decision was a pro forma document, drafted to parrot the language of the Health Care Quality Improvement Act but without specific findings of fact sufficient to allow this Court to determine actual compliance with the Act's standard of "reasonableness."

### *Objective Unreasonableness Under the Federal Immunity Statute—Procedural Errors*

162.

The initial suspension of Dr. Hanafi's surgical privileges was based on thoroughly inaccurate information, in at least three respects:

(1)     The Investigative Subcommittee "cherry picked" the members of the Emory Saint Joseph's Hospital's medical staff with whom the Subcommittee spoke;

(2)     The Investigative Subcommittee "cherry picked" the patient cases that the Subcommittee reviewed; and

(3)    The Investigative Subcommittee was influenced by materially false information concerning the outcomes of Dr. Hanafi's cases.

163.

An objectively fair hearing did not properly commence within thirty (30) days, as required by the By-laws of Emory Saint Joseph's Hospital.

164.

Rod G. Meadows, of Meadows, Macie & Morris, the Hearing Officer, computed the hours that the hospital took presenting its case, and gave Dr. Hanafi's counsel an extremely limited amount of time of approximately seven (7) hours. As the party with the burden of proof, such a severe time limitation severely disadvantaged Dr. Hanafi and denied him due process and a truly fair hearing.

165.

By reason of the corona virus pandemic, the Peer Review hearing was held virtually and was a procedural disaster. The hearing was required to start and stop many times. There was no continuity, and Dr. Hanafi frequently could not hear what was being said.

166.

As a result of the artificial time limitations placed on the Fair Hearing, Dr. Hanafi's counsel was not able to call a psychologist as a witness who had been retained as an expert.

167.

As a result of the artificial time limitations placed on the Fair Hearing, Dr. Hanafi's counsel was not able to call a surgeon as a witness who was prepared to testify to Dr. Hanafi's current surgical abilities.

168.

Dr. Hanafi's performance on a neuro-physiological examination, a critical rebuttal to the claim of age impairment, was similarly not offered by reason of the artificial time limitation.

### *Objective Unreasonableness—Improper Pressure on Witnesses*

169.

Dr. Sander R. Binderow, was a private, colorectal surgeon at Emory Saint Joseph's Hospital for over twenty-five (25) years.

170.

Drs. Hanafi and Binderow performed the exploratory laparotomy for Patient Y.H.

171.

Dr. Hanafi talked with Dr. Binderow about providing a letter of support, based upon his personal observation of Dr. Hanafi's surgical expertise. Dr. Binderow initially agreed to write the letter of support, and then he talked to a lawyer for Emory Saint Joseph's Hospital, and then to Dr. Gie N. Yu, Dr. Binderow's partner. Dr. Yu stated that she had talked to the administration at Emory Saint Joseph's Hospital and that they "*informed me I cannot write the letter because it could cause me trouble.*" Dr. Binderow further stated to Dr. Hanafi: "*I do not want to give you a letter, because they might do to me what they did to you. They are vicious.*"

172.

Dr. John W. McBroom, a surgeon who was at the time of the Fair Hearing affiliated with Piedmont Hospital and who also trained on the *da Vinci*® robotic surgical system, prepared a letter of support for Dr. Hanafi. However, at the Fair Hearing, Dr. Hanafi's counsel was unable to call Dr. McBroom as a witness or to use the letter by reason of the unreasonable time limitations placed on the Fair Hearing.

173.

Dr. Stephen M. Szabo, who was chief of credentialing at Emory Saint Joseph's Hospital at the time of the investigation, admitted to Dr. Hanafi that the

staff and patients "loved" Dr. Hanafi, that Dr. Hanafi's credentials were "good," and that Dr. Szabo did not understand why this was happening to Dr. Hanafi. Subsequently, Dr. Szabo testified at the hearing about Dr. Hanafi 's difficulty in "social" interactions.

### *Failure of Emory Saint Joseph's Hospital and Emory Healthcare to Comply with their own Manuals, By-Laws, and Regulations*

174.

All hospitals, including Emory Saint Joseph's Hospital, are bound by the Bylaws that they create. If a hospital fails to follow the procedures set forth in its Bylaws, a reviewing court can require the hospital to follow such procedures, even though the hospital may have, initially, been able, in its discretion, to prescribe different standards and rules. *Robles v. Humana Hosp. Cartersville*, 785 F. Supp. 989, 1001 (N.D. Ga. 1992) (Murphy, J.), *St. Mary's Hospital, Inc. v. Radiology Professional Corp.*, 421 S.E.2d 731, 726 (Ga. Ct. App. 1992).

175.

As more specifically alleged herein, Emory Saint Joseph's Hospital and Emory Healthcare failed to comply, in their efforts to terminate the credentials of Dr. Hanafi, with the procedural and substantive requirements of the Emory St. Joseph's Hospital Medical Staff Credentials Manual, the Hospital's By-laws, and other Rules and Regulations. The aforesaid Manual, By-laws, and Regulations,

Page 59 of 108

objectively failed to provide a Fair Hearing to Dr. Hanafi, as required by state and federal law, both on the face of such Manuals, By-laws, and Regulations, and as applied to Dr. Hanafi.

176.

ARTICLE 6 of the Medical Staff Credentials Manual of November 23, 2020, PEER REVIEW PROCEDURES FOR MATTERS INVOLVING PROFESSIONAL PERFORMANCE OF MEDICAL STAFF MEMBERS 6.A. COLLEGIAL INTERVENTION, provides

"(1) This Manual encourages the use of progressive steps by Medical Staff leaders and Hospital management, beginning with collegial and educational efforts, to address matters involving the professional performance of Medical Staff members. The goal of these efforts is to arrive at voluntary, responsive actions by the individual to resolve matters that have been raised.

(2) Collegial efforts may include, but are not limited to, counseling, sharing of comparative data, monitoring, additional training or education and Focused Professional Practice Evaluation.

(3) Collegial intervention efforts are encouraged, but are not mandatory, and shall be within the discretion of the appropriate Medical Staff leaders."

177.

No truly "collegial" efforts were not undertaken with respect to Dr. Hanafi, which is indicative of malicious intent and is objectively demonstrative of a failure to follow prescribed procedures.  The "collegial" efforts were made to obtain control of Dr. Hanafi's perceived advantages, including the robotic surgical system and his Blocked Time.

178.

ARTICLE 6 of the Medical Staff Credentials Manual of November 23, 2020, PEER REVIEW PROCEDURES FOR MATTERS INVOLVING PROFESSIONAL PERFORMANCE OF MEDICAL STAFF MEMBERS, INVESTIGATIONS provides:

"(a) Whenever a serious question has been raised, or where collegial efforts have not resolved an issue, regarding: (1) the clinical competence or clinical practice of any member of the Medical Staff, including the care, treatment or management of a patient or patients; (2) the known or suspected violation by any member of the Medical Staff of applicable ethical standards or the Bylaws, policies, Rules and Regulations of the Hospital or the Medical Staff; and/or (3) conduct by any member of the Medical Staff that is considered lower than the standards of the Hospital and the Medical Staff, or disruptive to the orderly operation of the Hospital or its Medical

Staff, including the inability of the member to work harmoniously and professionally with others, the matter may be referred to the Chief of Staff, the chairperson of the department, the chairperson of a standing committee, the President, or the Chairperson of the Board. (b) The person to whom the matter is referred shall make sufficient inquiry to satisfy himself or herself that the question raised is credible and, if so, shall forward it in writing to the Staff Executive Committee. (c) No action taken pursuant to this Section shall constitute an investigation."

179.

This provision is mandatory, and no such preliminary action was taken, which could have avoided the entire Peer Review process against Dr. Hanafi.

180.

ARTICLE 6 of the Medical Staff Credentials Manual of November 23, 2020, PEER REVIEW PROCEDURES FOR MATTERS INVOLVING PROFESSIONAL PERFORMANCE OF MEDICAL STAFF MEMBERS, Initiation of Investigation, provides:

"(a) When a question involving clinical competence or professional conduct is referred to, or raised by, the Staff Executive Committee, the Staff Executive Committee shall review the matter and determine whether to conduct an investigation, to direct the matter to be handled pursuant to another policy (such as

the Policy on Practitioner Health or other applicable policy), or to proceed in another manner. In making this determination, the Staff Executive Committee may discuss the matter with the individual. ***An investigation shall begin only after a formal determination by the Staff Executive Committee to do so.***

(b) ***The Staff Executive Committee shall inform the individual that an investigation has begun.*** Notification may be delayed if, in the Staff Executive Committee's judgment, informing the individual immediately would compromise the investigation or disrupt the operation of the Hospital or Medical Staff.

(c) The Board may also determine to commence an investigation and may delegate the investigation to the Staff Executive Committee, a subcommittee of the Board, or an ad hoc committee.

(d) The Chief of Staff shall keep the President fully informed of all action taken in connection with an investigation." [Emphasis supplied.]

181.

Upon information and belief, the Defendants failed to comply with the two mandates of this provision, in that (a) the Staff Executive Committee did not make a true "formal determination" but, rather responded to ad hoc, spurious complaints, by self-interested persons, to individual members of the Staff Executive Committee

and (b) Dr. Hanafi was not informed of the commencement of the investigation in a timely manner.

182.

ARTICLE 6 of the Medical Staff Credentials Manual of November 23, 2020, PEER REVIEW PROCEDURES FOR MATTERS INVOLVING PROFESSIONAL PERFORMANCE OF MEDICAL STAFF MEMBERS, Investigative Procedure**,** provides**:**

(a) Once a determination has been made to begin an investigation, the Staff Executive Committee ***shall*** either investigate the matter itself, request that the Credentials Committee conduct the investigation, or appoint an ad hoc committee to conduct the investigation. Any ad hoc committee ***shall*** not include partners, associates, or relatives of the individual being investigated, but may include individuals not on the Medical Staff. Whenever the matters raised concern the clinical competence of the individual under review, the ad hoc committee shall include a peer of the individual (e.g., physician or dentist).

(b) The committee conducting the investigation ("investigating committee") shall have the authority to review relevant documents and interview individuals. It shall also have available to it the full resources of the Medical Staff and the Hospital, as well as the authority to use outside consultants, if needed. An outside consultant

or agency may be used whenever a determination is made by the Hospital and investigating committee that: (1) the clinical expertise needed to conduct the review is not available on the Medical Staff; or (2) the individual under review is likely to raise, or has raised, questions about the objectivity of other practitioners on the Medical Staff; or (3) the individuals with the necessary clinical expertise on the Medical Staff would not be able to conduct a review without risk of allegations of bias, even if such allegations are unfounded.

(c) The investigating committee may require a physical and/or mental examination of the individual by health care professional(s) acceptable to it. The individual being investigated shall execute a release allowing (i) the investigating committee (or its representative) to discuss with the health care professional(s) conducting the examination the reasons for the examination; and (ii) the health care professional(s) conducting the examination to discuss and provide documentation of the results of such examination directly to the investigating committee.

(d) The individual shall have an opportunity to meet with the investigating committee before it makes its report. Prior to this meeting, the individual shall be informed of the general matters being investigated. At the individual ***shall*** be invited to discuss, explain, or refute the matters that gave rise to the investigation. A summary of the interview ***shall*** be made by the investigating committee and included

with its report. This meeting is not a hearing, and none of the procedural rules for hearings shall apply. The individual being investigated *shall* not have the right to be represented by legal counsel at this meeting.

(e) The investigating committee *shall* make a reasonable effort to complete the investigation and issue its report within 30 days of the commencement of the investigation, provided that an outside review is not necessary. When an outside review is necessary, the investigating committee *shall* make a reasonable effort to complete the investigation and issue its report within 30 days of receiving the results of the outside review. These time frames are intended to serve as guidelines and, as such, *shall* not be deemed to create any right for an individual to have an investigation completed within such time periods. In the event the investigating committee is unable to complete the investigation and issue its report within these time frames, it shall inform the individual of the reasons for the delay and the approximate date on which it expects to complete the investigation.

(f) At the conclusion of the investigation, the investigating committee shall prepare a report with its findings, conclusions, and recommendations.

(g) In making its recommendations, the investigating committee shall strive to achieve a consensus as to what is in the best interests of patient care and the smooth operation of the Hospital, while balancing fairness to the individual,

recognizing that fairness does not require that the individual agree with the recommendation. Specifically, the committee may consider: (1) relevant literature and clinical practice guidelines, as appropriate; (2) all of the opinions and views that were expressed throughout the review, including any report(s) from any outside review(s); (3) any information or explanations provided by the individual under review."

### 183.

Defendants Emory Saint Joseph's Hospital and Emory Healthcare failed and refused to afford Dr. Hanafi with the mandatory protections of the aforesaid provisions of Article 6.

### 184.

ARTICLE 6 of the Medical Staff Credentials Manual of November 23, 2020, PEER REVIEW PROCEDURES FOR MATTERS INVOLVING PROFESSIONAL PERFORMANCE OF MEDICAL STAFF MEMBERS, Recommendation, provides.

(a)     The Staff Executive Committee may accept, modify, or reject any recommendation it receives from an investigating committee. Specifically, the Staff Executive Committee may: (1) determine that no action is justified; (2) issue a letter of guidance, counsel, warning, or reprimand; (3) impose conditions for continued

appointment; (4) impose a requirement for monitoring or consultation; (5) recommend additional training or education; (6) recommend a period of Focused Professional Practice Evaluation; (7) recommend reduction of clinical privileges; (8) recommend suspension of clinical privileges for a specified term; (9) recommend revocation of appointment and/or clin(10) make any other recommendation that it deems necessary or appropriate.

(b)     A recommendation by the Staff Executive Committee that would entitle the individual to request a hearing shall be forwarded to the President, who shall promptly inform the individual by special notice. The President shall hold the recommendation until after the individual has completed or waived a hearing and appeal.

(c)     If the Staff Executive Committee makes a recommendation that does not entitle the individual to request a hearing, it shall take effect immediately and shall remain in effect unless modified by the Board.

(d)     In the event the Board considers a modification to the recommendation of the Staff Executive Committee that would entitle the individual to request a hearing, the President shall inform the individual by special notice. No final action shall occur until the individual has completed or waived a hearing and appeal.

(e)      When applicable, any recommendations or actions that are the result of an investigation or hearing and appeal shall be monitored by Medical Staff leaders on an ongoing basis through the Hospital's performance improvement activities or activities or pursuant to the applicable policies regarding conduct, as appropriate."

185.

Defendants Emory Saint Joseph's Hospital and Emory Healthcare failed and refused to afford Dr. Hanafi with the protections of section 6(a) in that Defendant Ludi and Dr. Mark P. Lachiewicz were a part of the M.E.C. and Investigative Subcommittee. Both Defendant Ludi and Dr. Lachiewicz were among the physicians who are repeatedly prevailed on Dr. Hanafi to give up his Blocked Time and both physicians desired to obtain Dr. Hanafi's patient and practice base for the benefit of the physicians at Emory Saint Joseph's Hospital who were members of the Emory Clinic.

186.

ARTICLE 6 OF THE MEDICAL STAFF CREDENTIALS MANUAL of November 23, 2020, PEER REVIEW PROCEDURES FOR MATTERS INVOLVING PROFESSIONAL PERFORMANCE OF MEDICAL STAFF MEMBERS, precautionary suspension, or restriction of clinical privileges, provides:

(a)    The Chief of Staff, the chairperson of a clinical department, the President, or the Board Chairperson shall each have the authority to suspend or restrict all or any portion of an individual's clinical privileges whenever, in their sole discretion, failure to take such action may result in imminent danger to the health and/or safety of any individual or may interfere with the orderly operation of the Hospital. The individual may be given an opportunity to refrain voluntarily from exercising privileges pending an investigation.

(b)    Precautionary suspension or restriction is an interim step in the professional review activity, but it is not a complete professional review action in and of itself. It shall not imply any final finding of responsibility for the sit the individual shall be provided a brief written description of the reason(s) for the precautionary suspension."

187.

Defendants St. Joseph and Emory Healthcare failed and refused to afford Dr. Hanafi with the aforesaid protections of Article 6, in that the suspension of Dr. Hanafi was medically unnecessary.

188.

ARTICLE 6 of the Medical Staff Credentials Manual of November 23, 2020, PEER    REVIEW    PROCEDURES    FOR    MATTERS    INVOLVING

PROFESSIONAL PERFORMANCE OF MEDICAL STAFF MEMBERS, Staff Executive Committee Procedure, provides:

(a)     The Staff Executive Committee shall review the matter resulting in a precautionary suspension or restriction within a reasonable time under the circumstances, not to exceed 14 days. Prior to, or as part of, this review, the individual shall be given an opportunity to meet with the Staff Executive Committee. The individual may propose alternatives other than precautionary suspension or restriction to protect patients, employees and/or the smooth operation of the Hospital, depending on the circumstances.

(b)     After considering the matters resulting in the suspension or restriction and the individual's response, if any, the Staff Executive Committee shall determine whether there is sufficient information to warrant a final recommendation, or whether it is necessary to commence an investigation. The Staff Executive Committee shall also determine whether the precautionary suspension or restriction should be continued, modified, or terminated pending the completion of the investigation (and hearing, if applicable).

(c)     There is no right to a hearing based on the imposition or continuation of a precautionary suspension or restriction. 40 Medical Staff Credentials Manual November 23, 2020, 6.C.3. Care of Patients: (a) Immediately upon the imposition of

a precautionary suspension or restriction, the Chief of Staff shall assign to another individual with appropriate clinical privileges responsibility for care of the suspended individual's hospitalized patients, or to aid in implementing the precautionary restriction, as appropriate. The assignment shall be effective until the patients are discharged. The wishes of the patient shall be considered in the selection of a covering physician. (b) All members of the Medical Staff have a duty to cooperate with the Chief of Staff, the department chairperson, the Staff Executive Committee, and the President in enforcing precautionary suspensions."

189.

Defendants St. Joseph and Emory Healthcare failed and refused to afford Dr. Hanafi with the protections of the aforesaid provisions of Article 6 in that his suspension was affected as required by the St. Joseph By-laws.

190.

ARTICLE 7 OF ST. JOSEPH'S AND EMORY HEALTHCARE'S HEARING AND APPEAL PROCEDURES OF THE MEDICAL STAFF CREDENTIALS MANUAL of November 23, 2020, Notice of Hearing and Statement of Reasons, provides  (a) The President shall schedule the hearing and provide, by special notice, the following: (1) the time, place, and date of the hearing; (2) a proposed list of witnesses who will give testimony at the hearing and a brief

summary of the anticipated testimony; (3) the names of the Hearing Panel members and Presiding Officer (or Hearing Officer) if known; and (4) a statement of the specific reasons for the recommendation, including a list of patient records (if applicable), and information supporting the recommendation. This statement may be revised or amended at any time, even during the hearing, so long as the additional material is relevant to the recommendation or the individual's qualifications and the individual has had a sufficient opportunity, up to 30 days, to review and rebut the additional information. (b) The hearing shall begin as soon as practicable, but no sooner than 30 days after the notice of the hearing, unless an earlier hearing date has been specifically agreed to in writing by the parties.

191.

Defendants St. Joseph and Emory Healthcare failed and refused to afford Dr. Hanafi with the aforesaid protections of Article 7's provisions.

192.

ARTICLE 7 OF ST. JOSEPH'S AND EMORY HEALTHCARE'S HEARING AND APPEAL PROCEDURES OF THE MEDICAL STAFF CREDENTIALS MANUAL of November 23, 2020, Basis of Hearing Panel Recommendation, provides:: "Consistent with the burden on the individual to demonstrate that he or she satisfies, on a continuing basis, all criteria for initial

appointment, reappointment and clinical privileges, the Hearing Panel shall recommend in favor of the Staff Executive Committee unless it finds that the individual who requested the hearing has proved, by a preponderance of the evidence, that the recommendation that prompted the hearing was arbitrary, capricious, or not supported by credible evidence. "

193.

Defendants St. Joseph and Emory Healthcare failed and refused to afford Dr. Hanafi with the protections of Article 7 in that the "fair" hearing was arbitrary, capricious, and not supported by credible evidence.

194.

ARTICLE 7 OF ST. JOSEPH'S AND EMORY HEALTHCARE'S HEARING AND APPEAL PROCEDURES OF THE MEDICAL STAFF CREDENTIALS MANUAL of November 23, 2020, Final Decision of the Board, provides: "Within 30 days after receipt of the Review Panel's recommendation, the Board shall render a final decision in writing, including specific reasons, and shall send special notice thereof to the individual. The Board may affirm, modify, or reverse the recommendation of the Review Panel or, in its discretion, refer the matter for further review and recommendation, or make its own decision based upon the

Board's ultimate legal responsibility to grant appointment and clinical privileges. A copy shall also be provided to the Staff Executive Committee for its information."

195.

Defendants St. Joseph and Emory Healthcare failed and refused to afford Dr. Hanafi with the protections of Article 7 in that no specific reasons, rendered with the specificity necessary for a reviewing court to determine their legal sufficiency.

***Malicious Reasons That the Peer Review Proceedings Against Dr. Hanafi Were Not Undertaken for Reasons Related to Patient Care***

196.

The offer of resolution of the Peer Review proceedings in exchange for abandonment of the robotic surgery practice, for the financial benefit of younger members of the St. Joseph surgical staff, establishes, as an objective matter, that the Peer Review processes against Dr. Hanafi were never undertaken in the interest of quality in patient care, as required by the Health Care Quality Improvement Act, but in the interests of other members of the St. Joseph surgical staff.

197.

Without an evidentiary record, it is impossible for Dr. Hanafi, or any physician similarly situated, to meet the "preponderance of the evidence" standard. In the absence of a full evidentiary record, the Fair Hearing panel's decision and the

Board's decision cannot be "reasonable" and do not meet the requirements of the Health Care Quality Improvement Act.

198.

The Fair Hearing Panel and the Board's decision cannot be "reasonable," as a matter of objective fact and as a matter of law because:

(1)    It was motivated by ethnic animus designed to inflict mental and emotional distress on Dr. Hanafi;

(2)    It was motivated by the financial self-interest of members of the Emory Clinic;

(3)    It was motivated by ageism and not by the concern for quality medical care of St. Joseph's patients;

(4)    It was motivated by the personal desires of a physician not to be involved in additional professional liability litigation; and

(5)    It was based on defamatory allegations, known to be false, with respect to the quality of Dr. Hanafi's care and his training.

199.

While evidence of mere "bias" is irrelevant to the question of "reasonableness" under 42 U.S.C. § 11112(a), and while the bad faith of Peer Review reviewers is generally not considered when determining whether the Peer

Review process was reasonable, a process cannot, as a matter of objective fact and as a matter of law be deemed "reasonable" when the process is based upon facts that

(1)     Were motivated by personal animus evidenced by discrimination based upon the country of Dr. Hanafi's birth;

(2)     Were motivated by actions that would constitute a violation of the Age Discrimination in Employment Act;

(3)     Were motivated by the personal desires of a physician to avoid personal embarrassment and discomfort;

(4)     Were based on allegations that amount to defamation, as a matter of law, because they related to the trade or business of Dr. Hanafi; and

(5)     Were motivated by statements that are tortious under the laws of the State of Georgia. Hanafi.

200.

Because the focus of a reviewing court is the objective sufficiency of the basis for the hospital's actions, the absence of a full evidentiary record at the Fair Hearing, by reason of the unreasonable time limitations and by reason of the discontinuity of the evidence at the Fair Hearing is fatal to the legal effect of St. Joseph's actions. While Peer Reviewers' state of mind is immaterial, their decisions to terminate

privileges must be objectively and legally "reasonable."  An illegal result is not a "reasonable" result.

### *Factual Allegations with Respect to the "Malice" of Defendants Under the Georgia Immunity Statute*

201.

Plaintiff has been advised by his counsel that the "malice" exception of O.C.G.A. §31-7-132 has been found to have been effectively preempted by the "reasonableness" standard of 42 U.S.C.A. § 11112(a)(2) *et. seq*., the Health Care Quality Improvement Act of 1986, in *Wood v. Archbold Medical Center*, *Inc.*, 738 F.Supp.2d 1298 (M.D. Ga. 2010) and in at least two decisions of the Georgia Court of Appeals, *Patrick v. Floyd Medical Center,* 255 Ga. App. 435, 444, 565 S.E.2d 491 (2002) and *Patton v. St. Francis Hospital,* 260 Ga. App. 202, 581 S.E.2d 551 (2003).  Upon information and belief, this issue has not been conclusively addressed by either the Supreme Court of Georgia, the United States Court of Appeals for the Eleventh Circuit, or the United States Supreme Court. Plaintiff's counsel has a good faith belief that the "malice" exception of Georgia law has not been federally preempted, as a matter of law, under the facts of the case at bar.

202.

O.C.G.A. § 31-7-132 provides immunity from civil liability "*unless [the healthcare provider or employee thereof] was **motivated by malice toward any person affected'***" by the Peer Review action. [Emphasis supplied.]

203.

Defendants, and each of them, acted with actual malice, in that Defendants, and each of them acted with knowledge that the information upon which they based their decision was false or they acted with reckless disregard of whether such information was false or not.

204.

O.C.G.A. § 31-7-132 expressly considers the Reviewer's motivation in determining whether the Peer Review action was warranted.

205.

The aforesaid Peer Review statute of Georgia provides immunity to health care providers engaged in Peer Review from ***all*** civil liability, including claims for equitable relief, unless there is malice, in fact or as a matter of law. The statute does not forbid Declaratory Judgment actions.

206.

While the Supreme Court of Georgia t has established that certain motives or bias are not relevant to a determination of whether a Peer Review system qualifies for immunity under the Georgia statute or the Health Care Quality Improvement Act.

207.

The Defendants, and each of them, are not entitled to immunity under Georgia's limited immunity statute, because St. Joseph's Peer Review action was thoroughly infected by national origin discrimination, age discrimination, personal bias, and self-interest, all of which constitute actual malice, as a matter of law.

208.

Malicious acts, as a matter of law, are taken with an intent to commit an unlawful act or to cause harm without legal justification or other excuse. In the case at bar, the Defendants, and each of them, violated statutory proscriptions of age discrimination, took purposeful actions to restrain competition, to harm Plaintiff's professional reputation, to inflict mental and emotional distress on the Plaintiff, and to interfere with the Plaintiff's business and professional relationships.

209.

Defendant Ludi expressly admitted to Dr. Hanafi that Defendant Ludi intended to place the responsibility for the adverse outcome in the case of Patient

Y.H. on Dr. Hanafi because Defendant Ludi had been the subject of a very difficult medical malpractice case, and Defendant Ludi said to Dr. Hanafi *"better you than me."* Defendant Ludi continued to falsely insist that that there had been a perforation of the bowel in the case of Patient Y.H.

## COUNT ONE

## VIOLATION OF THE AFFORDABLE CARE ACT OF 2010 , THE CIVIL RIGHTS ACT OF 1964, AND RELATED FEDERAL CIVIL RIGHTS STATUTES
### (As to All Defendants)

210.

Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 209 of their Verified Complaint in this Count One, to have the same force and effect as if fully re-alleged and re-stated herein.

211.

A proximate cause of the wrongful termination of Dr. Hanafi's surgical privileges at St. Joseph was the personal discrimination and animus directed toward him by reason of his birth in Egypt. Upon information and belief, the Peer Review processes of St. Joseph have been disparately and invidiously used, for discriminatory reasons, against foreign-born American physicians on the staff of St. Joseph in order to deprive such physicians from the benefits of the medical programs of St. Joseph, including the programs that receive Federal financial assistance.

212.

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, Pub. L. 88–352, title VI § 601, 78 Stat. 252 (July 2, 1964), prohibits exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on the ground of national origin.  The statute provides:  *"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."*

213.

Section 1557 of the Patient Protection and Affordable Care Act of 2010 ("Obamacare"), 42 U.S.C. §18116 (a), broadly prohibits discrimination, *inter alia*, on the basis of national origin in covered health programs or activities.

214.

Section 1557 of the Obamacare statute and its implementing administrative regulations provide that an individual shall not be excluded from participation in, be denied the benefits of, or be subjected to discrimination on the grounds prohibited under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* including discrimination based on national origin, *"under any health program or activity, any part of which is receiving federal financial assistance ...."*

215.

Section 1557 of the Obamacare statute reaffirms a national policy of nondiscrimination in health care programs and activities.  The statute, 42 U.S. C. § 18116 (a) provides, in relevant part: "*Except as otherwise provided for in this title ... an individual shall not, on the ground prohibited under title VI of the **Civil Rights Act of 1964 (42 U.S.C. 2000d** et seq.), ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title . The enforcement mechanisms provided for and available under such title VI ... shall apply for purposes of violations of this subsection.*"

216.

The United States Supreme Court has established an implied private right of action under Title VI, holding that it is "**beyond dispute that private individuals may sue**" to address intentional discrimination. *Barnes v. Gorman*, 536 U.S. 181, 185 (2002), quoting *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

217.

The Obamacare statute, at 42 U.S. C. § 18116 (b), further provides, in relevant part, a savings clause for private causes of action to enforce its provisions: *"Nothing in this title shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals aggrieved under title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. "*

218.

The Defendants, and each of them (including, but not limited to, Emory Healthcare and St. Joseph, participate in *"health program[s] or activit[ies],  part[s] of which"* receive *"federal financial assistance,"* such as Medicare.

219.

The revocation of Dr. Hanafi's credentials at St. Joseph was an act of discrimination based upon his national origin and such revocation denied him participation in medical activities which receive Federal financial assistance.

220.

Pursuant to 42 U.S.C. § 1981(a), codified from the Civil Rights Act of 1866: *- All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, ... and to the full and equal benefit of all laws and proceedings for the security of persons and property as is*

*enjoyed by white citizens*, ... " 42 U.S.C. § 1981(b) provides: "*For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.*" Dr. Hanafi, as a non-white citizen of the United States, is entitled to the protection of these statutes with respect to his hospital staff privilege contracts.

221.

Pursuant to 42 U.S.C. § 1982, codified from the Civil Rights Act of 1866: "*All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to ... hold, ... personal property.*" Dr. Hanafi, as a non-white citizen of the United States, is entitled to the protection of this statute with respect to his hospital staff privilege contracts, agreements, and business relationships.

222.

Pursuant to 42 U.S.C. § 1983, "*Every person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....*" The Defendants, and each of

them, have, under color of the Georgia Peer Review immunity statute, deprived Dr. Hanafi of his statutory and Constitutional right to hold property, *to wit*—his hospital staff privilege contracts, agreements, and business relationships.

## COUNT TWO

### MANDATORY INJUNCTIVE RELIEF
**(As to Emory Healthcare and St. Joseph)**

### 223.

Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 222 of their Verified Complaint in this Count Two, to have the same force and effect as if fully re-alleged and re-stated herein.

### 224.

Plaintiffs ask that this Court exercise is mandatory equitable powers to require that Emory Healthcare and St. Joseph restore to Dr. Hanafi his medical staff privileges, including, but not limited to, his surgical privileges at St. Joseph, to have the same effect as such privileges existed prior to their wrongful termination.

### 225.

Plaintiffs, and each of them, have been irreparably injured by the wrongful actions of the Defendants.

226.

The burdens to be placed upon the Defendants by the grant of equitable relief are far outweighed by the continued harm to the Plaintiffs.

227.

The grant of equitable relief in this matter will be in the public interest.

228.

Dr. Hanafi is likely to succeed on the merits of this action.

## COUNT THREE

### DECLARATORY JUDGMENT THAT ST. JOSEPH'S PEER REVIEW PROCESS FAILS, ON ITS FACE AND AS A STRUCTURAL MATTER, TO MEET THE LIMITED IMMUNITY REQUIREMENTS OF EITHER O.C.G.A. § 31-7-130, *et seq. (the "*GEORGIA IMMUNITY STATUTE") OR THE HEALTH CARE QUALITY IMPROVEMENT ACT OF 1986, 42 U.S.C. §§ 11101-11152 (the "FEDERAL IMMUNITY STATUTE")
### (As to Defendants St. Joseph and Emory Healthcare)

229.

Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 228 of their Verified Complaint in this Count Three, to have the same force and effect as if fully re-alleged and re-stated herein.

230.

The Federal Declaratory Judgment Act, 28 U.S. C. § 2201, provides" "*In a case of actual controversy within its jurisdiction, ... any court of the United States,*

*upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."*

231.

The matter *sub judice* is a "case or controversy" pursuant to Article III, section two of the United States Constitution. The facts alleged in this Verified Complaint demonstrate there is a substantial controversy between parties, with adverse legal interests, and the controversy has such existence and immediacy as to warrant a declaratory judgment.  Moreover, declaratory relief is appropriate to guide the future conduct of Emory Healthcare and St. Joseph in matters arising from efforts to revoke the medical staff credentials of physicians.

232.

Moreover, as required by the United States Supreme Court, the dispute between Plaintiffs and the Defendants is "*definite and concrete, touching the legal relations of parties having adverse legal interests,*" "*real and substantial,*" and "*admi[ts] of specific relief through a decree of a conclusive character, as*

*distinguished from an opinion advising what the law would be upon a hypothetical state of facts."*

233.

Upon information and belief, the Plaintiffs have standing, as a matter of law, under the Federal Declaratory Judgment Act, in that the Plaintiffs have suffered injuries in fact, as a result of the revocation of Dr. Hanafi's surgical privileges.  There is a causal connection between the extant injuries and the Defendants' wrongful conduct, and it is likely that the Plaintiffs' injuries will be redressed in the matter *sub judice*.

234.

This Court also has supplementary jurisdiction under the Georgia Declaratory Judgment Act, O.C.G.A. § 9-4-2(a), which provides, in relevant part, that "*the respective superior courts of this state*" shall have power "*to declare rights and other legal relations of any interested party petitioning for such declaration, whether or not further relief is or could be prayed; and the declaration shall have the force and effect of a final judgment or decree and be reviewable as such.*"  Dr. Hanafi prays that this Court declare the rights and legal relations with respect to his clinical credentials at St. Joseph.

235.

The Georgia Code declares further that declaratory relief is available whenever the "*ends of justice require that the declaration should be made.*"  The ends of justice require that there be a judicial determination of the legality of St. Joseph's termination of Dr. Hanafi's credentials.

236.

Under Georgia law, relief by way of declaratory judgement is available, notwithstanding the availability of other adequate legal or equitable remedies.  Dr. Hanafi does not, by filing this action under the Georgia Declaratory Judgments Act, waive his right to pursue any other or further appropriate remedies that may be available to him at law or in equity.

237.

The procedures set forth in the St. Joseph and Emory Healthcare Peer Review Manual are facially inadequate to provide the "reasonable" and "fair" hearing required by federal and Georgia law.  Specifically, the procedures do not assure that the accused physician has adequate time to present his case.  Moreover, the procedures, in accordance with the federal immunity statute, unfairly provide that the Investigatory Committee's finding have a presumption of correctness.  Such a

presumption is fundamentally unfair as a matter of procedural and substantive due process under the Constitutions of the United States and the State of Georgia.

## COUNT FOUR

### DECLARATORY JUDGMENT THAT THE ST. JOSEPH AND EMORY PEER REVIEW PROCESS AS APPLIED TO DR. HANAFI FAILED TO MEET THE STANDARDS OF EITHER THE GEORGIA OR FEDERAL IMMUNITY STATUTES
**(As to Defendants St. Joseph and Emory Healthcare)**

238.

Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 237 of their Verified Complaint in this Count Four, to have the same force and effect as if fully re-alleged and re-stated herein.

239.

The initiation and prosecution of the Peer Review action seeking revocation of Dr. Hanafi's credentials was motivated by the professional and financial self-interest of the Defendants, including, but not limited to, Emory Healthcare and St. Joseph; by the discriminatory animus and malice of the individual Defendants, and for other unlawful motives.   Specifically, in addition to the national origins discrimination evidenced against Dr. Hanafi, the Peer Review revocation proceeding initiated against Dr. Hanafi was (*a*) designed to scapegoat Dr. Hanafi for the outcome in the case of Patient Y.H., (*b*) sought to eliminate the Blocked Time priority that

Dr. Hanafi had historically been provided in the St. Joseph operating rooms, (*c*) sought to eliminate Dr. Hanafi's use of the *da Vinci*® robotic operating system, (*d*) sought to expand the power and influence of the Emory Clinic medical staff, to the detriment of members of the St. Joseph medical staff, such as Dr. Hanafi, who were not members of the Emory Clinic.

## <u>COUNT FIVE</u>

### <u>DECLARATORY JUDGMENT THAT ST. JOSEPH FAILED TO PROVIDE DR. HANAFI WITH A "FAIR HEARING," FREE OF MALICE, PRIOR TO THE TERMINATION OF HIS MEDICAL STAFF CREDENTIALS, AS REQUIRED BY STATE AND FEDERAL LAW</u>
**(As to Defendants St. Joseph and Emory Healthcare)**

240.

Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 239 of their Verified Complaint in this Count Five, to have the same force and effect as if fully re-alleged and re-stated herein.

241.

The procedures and evidentiary presumptions of the St. Joseph Peer Review process, as applied to Dr. Hanafi, were patently and fundamentally unfair and contrary to traditional notions of fairness and due process in adversary proceedings.

242.

Specifically, Dr. Hanafi was not provided with adequate time to present his evidence at the Peer Review hearing and was, thus, unable to present critical evidence concerning his physical abilities and mental acuity to perform surgery. Also, the Peer Review hearing was conducted virtually and in a disjointed manner that prejudiced Dr. Hanafi's presentation of his case.

## COUNT SIX

## DECLARATORY JUDGMENT THAT THE REVOCATION OF DR. HANAFI'S CREDENTIALS WAS MOTIVATED BY "MALICE" AND THAT, FOR THIS REASON, DEFENDANTS ARE NOT ENTITLED TO THE LIMITED IMMUNITY AFFORDED UNDER GEORGIA LAW
### (As to Defendants St. Joseph and Emory Healthcare)

243.

Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 242 of their Verified Complaint in this Count Six, to have the same force and effect as if fully re-alleged and re-stated herein.

244.

Plaintiffs are aware that opinions of the Georgia Court of Appeals have held that the "malice" exception of the Georgia immunity statute is, as a matter of law, preempted by the "reasonableness" requirements of the federal immunity statute. Plaintiffs' counsel has a good faith belief that the Georgia "malice" exception has

not been preempted by the federal immunity statue.  Upon information and belief, the Georgia Supreme Court has not held that the Georgia statute is preempted, and neither the United States Supreme Court nor the United States Court of Appeals for the Eleventh Circuit has held that the Georgia statute is preempted.

245.

The termination of Dr. Hanafi's credentials, by reason of his national origin, was a violation of the Civil Rights Act, and it is, therefore, an act of "malice" under Georgia law.

246.

The termination of Dr. Hanafi's credentials as a result of his age is wrongful It is, therefore, an act of "malice" under Georgia law.

247.

The termination of Dr. Hanafi's credentials in an effort to shield Defendant Ludi from scrutiny of his clinical decisions in an unrelated medical negligence case is wrongful.  It is, therefore, an act of "malice" under Georgia law.

248.

The termination of Dr. Hanafi's credentials in an effort to scapegoat Dr. Hanafi for the negligence of Defendant St. Joseph and others is wrongful.  It is, therefore, an act of "malice" under Georgia law.

## COUNT SEVEN

### DECLARATORY JUDGMENT THAT THE REVOCATION OF DR. HANAFI'S MEDICAL STAFF CREDENTIALS WAS EFFECTED BY UNREASONABLE PROCEDURES AND WITHOUT DUE PROCESS AND THAT, FOR THESE REASON, DEFENDANTS ARE NOT ENTITLED TO THE LIMITED IMMUNITY AFFORDED UNDER THE FEDERAL IMMUNITY STATUTE
**(As to Defendants St. Joseph and Emory Healthcare)**

249.

Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 248 of this Verified Complaint in this Count Seven, to have the same force and effect as if fully re-alleged and re-stated herein.

250.

The termination of Dr. Hanafi's staff privilege agreement is a violation of Title VI of the Civil Rights Act of 1964.  It is, therefore, not "reasonable" under the federal immunity statute.

251.

The termination of Dr. Hanafi's credentials as a result of his age was wrongful, as a matter of law.  It is, therefore, not "reasonable" under the federal immunity statute.

252.

The termination of Dr. Hanafi's credentials in an effort to shield other physicians from scrutiny is wrongful.  It is, therefore, not "reasonable" under the federal immunity statute.

## COUNT EIGHT

## TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONSHIPS
**(As to All Defendants)**

253.

Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 252 of their Verified Complaint in this Count Eight, to have the same force and effect as if fully re-alleged and re-stated herein.

254.

Prior to the revocation of his staff privileges and credentials, a valid and enforceable staff privilege contract existed between Dr. Hanafi and St. Joseph.

255.

At all times relevant herein, the Defendants, and each of them, were fully aware of the contractual relationship between Dr. Hanafi and St. Joseph.

256.

The Defendants, and each of them, induced an intentional and unjustified breach of the contract between Dr. Hanafi and St. Joseph.

257.

The termination of Dr. Hanafi's staff privilege agreement with St. Joseph was proximately caused by the intentional and wrongful conduct of the Defendants, and each of them.

258.

In addition to the contract between Dr. Hanafi and St. Joseph, non-contractual business relationships, including, but not limited to, the Blocked Time arrangement, existed between Dr. Hanafi and St. Joseph and between Dr. Hanafi and his patients.

259.

At all times relevant herein, the Defendants, and each of them, had knowledge of the aforesaid non-contractual business relationships.

260.

The Defendants, and each of them, intended to induce the breach of the non-contractual relationships between Dr. Hanafi and St. Joseph and between Dr. Hanafi and his patients.

261.

The Defendants' intentional and wrongful conduct was the proximate cause of the termination of Dr. Hanafi's staff privilege contract with St. Joseph and the destruction of Dr. Hanafi's non-contractual business relationships with St. Joseph and the Plaintiffs' business and professional relationships with Dr. Hanafi's patients.

262.

The Plaintiffs have suffered damages in the form of lost revenue, including anticipated future revenue, as the result of the Defendants' tortious interference with the Plaintiffs contractual and business relationships.

**COUNT NINE**

**INTENTIONAL INFLICTION OF EMOTIONAL AND MENTAL DISTRESS**
**(As to All Defendants)**

263.

Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 262 of their Verified Complaint in this Count Nine, to have the same force and effect as if fully re-alleged and re-stated herein.

264.

Dr. Hanafi has suffered severe emotional and mental distress as the result of the initiation of the Peer Review proceedings against him and as a result of the revocation of his credentials at St. Joseph.

265.

The Defendants, and each of them, in the initiation and conduct of the Peer Review proceedings against Dr. Hanafi, acted intentionally or recklessly.

266.

The intentional conduct of the individual Defendants, and each of them, in the initiation of Peer Review proceedings against Dr. Hanafi was extreme and outrageous in that such conduct, *inter alia*, was based on knowing falsehoods and upon conduct that amounted to invidious discrimination based upon Dr. Hanafi's nation of origin.

267.

The intentional conduct of the individual Defendants, and each of them, was the proximate cause of the emotional and mental distress suffered by Dr. Hanafi.

268.

The Plaintiffs have suffered damages in the form of lost revenue, including anticipated future revenue, as the result of the emotional and mental distress suffered by Dr. Hanafi, which was directly and proximately caused by the Defendants.

## COUNT TEN

## DEFAMATION PER SE
### (As to All Defendants)

269.

Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 268 of this Verified Complaint in this Count Ten, to have the same force and effect as if fully re-alleged and re-stated herein.

270.

Prior to and during the Peer Review proceeding initiated against Dr. Hanafi, Defendant Ludi, Defendant McGahan, Defendant Williamson, and Defendant Kooby made statements of alleged fact, concerning Dr. Hanafi, that were either knowingly false or could have been known to have been false after reasonable inquiry. Such false statements were made by the individual Defendants' on behalf of Emory Healthcare and St. Joseph and in the course of such individuals' performance of their official responsibilities for the corporate Defendants. The false statements included, but were not limited to, the claims that (a) Dr. Hanafi punctured

the bowel of Patient Y.H;. and that (b) upon her readmission to St. Joseph, Patient Y.H. was septic.

271.

The false statements concerning Dr. Hanafi were communicated to third parties with the intent of harming Dr. Hanafi, including, but not limited to, the Physicians National Database, the Peer Review investigatory committee, the Peer Review Panel, and the Board of Trustees.  The communications of such false information were not privileged, because the statements were made maliciously and were not immunized by either the laws of the United States or the State of Georgia.

272.

The individual Defendants made the false statements concerning Dr. Hanafi either intentionally or as a result of actions that were grossly negligent.

273.

The false statements concerning Dr. Hanafi amounted to *per se* defamation, under O.C.G.A. §51-5-4(a) (3), because such falsehoods were "*charges against another in reference to his trade, office, or profession, calculated to injure him therein ... .*";

## COUNT ELEVEN

## PUNITIVE DAMAGES
### (As to All Defendants)

274.

Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 273 of this Verified Complaint in this Count Eleven, to have the same force and effect as if fully re-alleged and re-stated herein.

275.

The tortious conduct of the Defendants toward Dr. Hanafi exhibited "willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences," as proscribed by O.C.G.A. § 51-12-5.1(b).

276.

The jury should impose punitive damages in such an amount, in light of the worldly circumstances of the Defendants sufficient to punish such Defendants, and each of them, for their misconduct.

277.

The jury should impose punitive damages in such an amount, in light of the worldly circumstances of the Defendants, sufficient to deter the Defendants and others from engaging in similar tortious misconduct in the future.

278.

The Defendants, and each of them, acted with the specific intent to harm Dr. Hanafi; therefore, pursuant to O.C.G.A. § 51-12-5.1(f), there is no limit on the amount of punitive damages, under Georgia law, that may be awarded by the jury.

## **COUNT TWELVE**

## **ATTORNEYS FEES AND OTHER EXPENSES OF LITIGATION**
### **(As to All Defendants)**

279.

Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 278 of this Verified Complaint in this Count Twelve, to have the same force and effect as if fully re-alleged and re-stated herein.

280.

Pursuant to 42 U.S.C. § 1988 (b): "*In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, ... of this title, ..., [or] title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], ... , the court, in its discretion, may allow the prevailing party...  a reasonable attorney's fee as part of the costs ... .*"

281.

The Plaintiffs' action, seeking redress for national origin discrimination, is, within the meaning of 42 U.S.C. 1988 (b), an "action or proceeding to enforce the provision[s]" of the enumerated civil rights laws of the United States.

282.

The Defendants, and each of them, are liable to the Plaintiffs, under 42 U.S.C. §1988(b), for the Plaintiffs' attorneys' fees and other expenses of litigation.

283.

Pursuant to O.C.G.A. § 13-6-11, the plaintiffs may recover attorneys' fees and the other expenses of litigation, "*where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.*"

284.

This Court may award attorneys' fees and expenses of litigation, as allowed by O.C.G.A. § 13-6-11, pursuant to the supplementary jurisdiction of this Court over claims arising under Georgia law.

285.

By reason of the Defendants' commission of the intentional torts, alleged in Count Eight, Count Nine, and Count Ten, the Defendants, and each of them, have, as a matter of Georgia law, acted in "bad faith."

286.

The Defendants, and each of them, are liable to the Plaintiffs, under O.C.G.A. § 13-6-11, for the Plaintiffs' attorneys fees and expenses of litigation.

**WHEREFORE**, the Plaintiffs, **MAGDI M. HANAFI, M.D. and GYN & FERTILITY SPECIALISTS, INC.,** demand judgment against the Defendants, **SAINT JOSEPH'S HOSPITAL OF ATLANTA, INC.; EMORY HEALTHCARE, INC.; GARY ALLEN. LUDI, M.D.,** individually and as Chief of Staff of Emory Saint Joseph's Hospital of Atlanta, Inc.; **THOMAS P. MCGAHAN, M.D.,** individually and as Medical Operating Officer of Saint Joseph's Hospital of Atlanta, Inc., **SHERRY ROGERS**; **MARGARET WILLIAMSON**, individually and as Chair of the Peer Review Committee of Saint Joseph's Hospital of Atlanta, Inc.; and **DAVID ABRAHAM. KOOBY, M.D.**, individually and as Chief of Surgery, Emory Saint Joseph's Hospital of Atlanta, Inc., and each of them, on each Count of his Complaint, and they further prays for: **FOR DECLARATORY AND MANDATORY EQUITABLE RELIEF** as follows**:**

1.      The Reinstatement and Restoration, *instanter*, of Dr. Hanafi's full credentials at Emory St. Joseph's Hospital, pursuant to **COUNT TWO** and, to this end, that this Court:

(a)     Issue its Preliminary Injunction, prior to the trial of this matter, reinstating Dr. Hanafi's surgical credentials at Emory St. Joseph Hospital, until further Order of the Court; and

(b)     Issue its Permanent Injunction reinstating Dr. Hanafi's full surgical credentials at Emory St. Joseph Hospital; and

(c)     Issue its Permanent Injunction requiring that Emory Healthcare and St. Joseph correct the materially false information previously supplied to the National Physician's Databank.

2.      A Declaration, pursuant to **COUNT THREE**, **COUNT FOUR**, **COUNT FIVE**, and **COUNT SIX**, that the Peer Review process at St. Joseph's Hospital is structurally deficient on its face and unlawful as applied to Dr. Hanafi.

3.      Compensatory damages, pursuant to **COUNT ONE** (national origin discrimination), **COUNT EIGHT** (tortious interference with contractual and business relationships), **COUNT NINE** (intentional infliction of emotional and mental distress), and **COUNT TEN** (defamation) that have been proximately caused

by the wrongful actions of Defendants, in an amount not less than **SIX HUNDRED THOUSAND AND 00/100 DOLLARS ($600,000.00)**;

4.      Punitive damages, pursuant to **COUNT ELEVEN**, in an amount, determined by the enlightened conscience of a fair and impartial jury, sufficient to punish the Defendants and to deter their wrongful conduct in the future**;**

5.      Reasonable attorneys' fees and the other expenses of this litigation, pursuant to **COUNT TWELVE**, as provided by 42 U.S.C. §1988 and O.C.G.A. § 13-6-11; and

6.      Such other and further relief as this Court deems just and proper.

Plaintiffs demand **TRIAL BY JURY** of all matters subject to determination by a jury**.**

This 3rd day of May, 2022.

Respectfully submitted,

HASSON LAW GROUP, LLP

**/s/ Keith Hasson**_____
Keith S. Hasson
Georgia Bar No. 336383
Michael F. O'Neill
Georgia Bar No. 553740
Mariana Melendez
Georgia Bar No. 555663

**Counsel for the Plaintiffs**

3379 Peachtree Road, N.E.
Suite 625
Atlanta, Georgia 30326
Telephone: 678-701-2869
keith@hassonlawgroup.com
mike@hassonlawgroup.com
mariana@hassonlawgroup.com

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GYN & FERTILITY SPECIALISTS, INC.  )
and MAGDI M. HANAFI, M.D.,  )
  )
     Plaintiffs,  )    CIVIL ACTION FILE NO.
  )    1:22-CV-1753-TWT-RGV
     *vs.*  )
  )
SAINT JOSEPH'S HOSPITAL OF  )
ATLANTA, INC., et al.  )
  )
     Defendants.  )

## VERIFICATION OF GYN & FERTILITY SPECIALISTS, INC.

**COMES NOW** before the undersigned attesting officer, authorized by law to administer oaths, **MAGDI M. HANAFI, M.D.,** who first being duly sworn, deposes on oath and states as follows:

1.

I am the Chief Executive Officer, Chief Financial Officer, sole Director, and sole shareholder of Gyn & Fertility Specialists, Inc., a Georgia corporation and co- Plaintiff, with me, in the above-styled action.

2.

Under the requirements of the Georgia Business Corporation Code, Gyn & Fertility Specialists, Inc., is in good standing, having filed all necessary documents and made all necessary payments to the Georgia Secretary of State and has corporate capacity to institute this action.

3.

Gyn & Fertility Specialists, Inc. has been duly authorized by appropriate corporate action to commence this legal action.

4.

On behalf of Gyn & Fertility Specialists, Inc. and in the official capacities described above, I have reviewed each of the allegations of the above-styled Complaint, specifically including those related to Gyn & Fertility Specialists, Inc.

5.

On behalf of Gyn & Fertility Specialists, Inc. and based upon my direct, personal knowledge, each of the aforesaid allegations, other than those expressly stated to be made upon information and belief, are true and correct.

6.

I understand this Verification to be given under the penalties of perjury, and I understand the nature of those penalties.

This _21_ day of April, 2022.

_____
MAGDI M. HANAFI, M.D.

SWORN TO AND SUBSCRIBED

BEFORE ME, THIS _21_ DAY OF APRIL

_____
NORTARY PUBLIC

My commission expires: _Mar 4, 2025_

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| GYN & FERTILITY SPECIALISTS, INC. | ) | |
| and MAGDI M. HANAFI, M.D., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| *vs.* | ) | |
| | ) | |
| SAINT JOSEPH'S HOSPITAL OF | ) | CIVIL ACTION FILE NO. |
| ATLANTA, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

---

**VERIFICATION OF MAGDI M. HANAFI, M.D.**

---

**COMES NOW** before the undersigned attesting officer, authorized by law to administer oaths, **MAGDI M. HANAFI, M.D.**, who first being duly sworn, deposes on oath and states as follows:

1.

I am the individual Plaintiff in the above-styled action.

2.

I have reviewed each of the allegations of the above-styled Complaint.

3.

Based upon my direct personal knowledge, each of the aforesaid allegations, other than those expressly stated to be made upon information and belief, are true and correct.

4.

I understand this Verification to be given under the penalties of perjury, and I understand the nature of those penalties.

This ___2▲\day of April, 2022.

_____
MAGDI **M.** HANAFI, M.D.

SWORN TO AND SUBSCRIBED

BEFORE ME, THIS _21_ DAY OF APRIL

_____
NORTARY PUBLIC

My commission expires: _Mar 4, 202_